Home (http://www.miami-dadeclerk.com/home.asp)
Online Services (http://www.miami-dadeclerk.com/online_services.asp)
About Us (http://www.miami-dadeclerk.com/about.asp)
Contact Us (http://www.miami-dadeclerk.com/contact.asp)
My Account (https://www2.miami-dadeclerk.com/PremierServices/login.aspx)



# Miami-Dade County Civil, Family and Probate Courts Online System

◀◀ Back to Search

## MIADECO CORP. ET AL VS MIAMI-DADE COUNTY

**Local Case Number:** 2016-004244-CA-01

**Filing Date:** 02/22/2016

**State Case Number:** 132016CA004244000001

**Case Type:** Challenge - Statute or Ordinance

**Consolidated Case No.:** N/A

**Judicial Section:** CA40

**Case Status:** OPEN

### 👥 Parties
**Number of Parties: 4** ➕

### 🔨 Hearing Details
**Number of Hearing: 1** ➕

### 🔊 Dockets
**Dockets Retrieved: 13** ➖

| Date | Book/Page | Docket Entry | Event Type | Comments |
|------|-----------|--------------|------------|----------|
| 06/03/2016 | | Case Management Conference | Hearing | |
| 05/09/2016 | | Receipt: | Event | **RECEIPT#:3410003 AMT PAID:$20.00 ALLOCATION CODE QUANTITY UNIT AMOUNT 3120-COPY 20 $1.00 $20.00 TENDER TYPE:VISA CARD TENDER AMT:$20.00 RECEIPT DATE:05/09/2016 REGISTER#:341 CASHIER:GINOG** |
| 05/06/2016 | | Receipt: | Event | **RECEIPT#:3030008 AMT PAID:$10.00 ALLOCATION CODE QUANTITY UNIT AMOUNT 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:CHECK TENDER AMT:$10.00 RECEIPT DATE:05/06/2016 REGISTER#:303 CASHIER:AVLO** |
| 05/06/2016 | | Receipt: | Event | **RECEIPT#:3030006 AMT PAID:($10.00) ALLOCATION CODE QUANTITY UNIT AMOUNT 3139-SUMMONS ISSUE FEE 1 ($10.00) ($10.00) TENDER TYPE:CHECK TENDER AMT:($20.00) RECEIPT DATE:05/06/2016 REGISTER#:303 CASHIER:AVLO** |
| 05/06/2016 | | Receipt: | Event | **RECEIPT#:3030004 AMT PAID:$10.00 ALLOCATION CODE QUANTITY UNIT AMOUNT 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:CHECK TENDER AMT:$20.00 RECEIPT DATE:05/06/2016 REGISTER#:303 CASHIER:AVLO** |
| 05/06/2016 | | 20 Day Summons Issued | Service | |
| 05/06/2016 | | 20 Day Summons Issued | Event | *Parties: Miami-Dade County* |
| 05/04/2016 | | Amended Complaint | Event | |

| | 04/07/2016 | Notice of Hearing- | Event | **04-19-2016** |
|---|---|---|---|---|
| | 03/28/2016 | Order Setting the Initial Case Management Conference | Event | **AT 9 AM** *Due Date: 06/03/2016* *Complete Date:* |
| | 02/23/2016 | Receipt: | Event | **RECEIPT#:3670155 AMT PAID:$401.00 NAME:PATINO, RALPH GEORGE 550 BILTMORE WAY STE 740 CORAL GABLES FL 33134 ALLOCATION CODE QUANTITY UNIT AMOUNT 3100-CIRCUIT FILING FEE 1 $401.00 $401.00 TENDER TYPE:E-FILING ACH TENDER AMT:$401.00 RE** |
| | 02/22/2016 | Complaint | Event | |
| | 02/22/2016 | Civil Cover | Event | |

**◀◀ Back to Search**

**Please be advised:**

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services (https://www2.miami-dadeclerk.com/Developers). To review the complete Miami-Dade County Disclaimer, follow this link: http://www.miamidade.gov/info/disclaimer.asp (http://www.miamidade.gov/info/disclaimer.asp)

Online Case Home (default.aspx)   |

Family Court Information (http://www.miami-dadeclerk.com/families_court.asp)   |

Probate Court Information (http://www.miami-dadeclerk.com/families_probate.asp)   |

Email (http://feedback.miamidade.gov/Community/se.ashx?s=57F314587A23E37E)   |

Login (/PremierServices/login.aspx?ReturnUrl=https://www2.miami-dadeclerk.com/ocs/Search.aspx)   |

Home (http://www.miami-dadeclerk.com/home.asp)   |

Privacy Statement (http://www.miamidade.gov/info/privacy_and_security.asp)   |   (http://www.miamidade.gov)

MIAMI-DADE COUNTY

https://www2.miami-dadeclerk.com/ocs/Search.aspx 3/4

Case 1:16-cv-21976-DPG    Document 1-2    Entered on FLSD Docket 06/01/2016    Page 4 of 68

Disclaimer (http://www.miamidade.gov/info/disclaimer.asp)   |

Contact Us (http://www.miami-dadeclerk.com/contact.asp)   |

About Us (http://www.miami-dadeclerk.com/about.asp)

2015 Clerk of the Courts. All Rights reserved.

S0142976

1516-003
RGP/RPF

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

MIADECO CORP., a Florida Corporation,     CASE NO.
B & S TAXI CORP., a Florida
Corporation, and CHECKER CAB
OPERATORS, INC., a Florida
OPERATORS, INC., a Florida
Corporation, individually and on behalf of     **CLASS REPRESENTATION**
others similarly situated,

     Plaintiffs,

v.

MIAMI-DADE COUNTY, a political
subdivision of the State of Florida,

     Defendant.

_____/

## CLASS ACTION COMPLAINT

Plaintiffs, MIADECO CORP. ("MIADECO"), a Florida Corporation, B&S TAXI CORP.

("B&S"), a Florida Corporation, and CHECKER CAB OPERATORS, INC., a Florida

Corporation, individually and on behalf of all others similarly situated (collectively referred to

herein as "Plaintiffs"), by their undersigned attorneys, hereby file suit against the Defendant,

MIAMI-DADE COUNTY ("MDC"), a political subdivision of the State of Florida, and allege as

follows:

### THE PARTIES

1. Plaintiffs are for-hire license owners, the possession of which enables them to provide

   transportation in return for compensation in Miami-Dade County. Plaintiffs bring this

   class action on behalf of themselves and all other regular for-hire license holders in

   Miami-Dade County who are required to comply with all Miami-Dade County

   ordinances relating to the provision of for-hire transportation services.

2. Plaintiff MIADECO is a Florida corporation with its principal place of business in Miami-Dade County, Florida. It owns one hundred-fifteen (115) for-hire licenses in Miami-Dade County. It is otherwise *sui juris*.

3. Plaintiff B & S is a Florida corporation with its principal place of business in Miami-Dade County, Florida. It owns nineteen (19) for-hire licenses in Miami-Dade County. It is otherwise *sui juris*.

4. Plaintiff CHECKER CAB OPERATORS, INC. is a Florida corporation with a principal place of business in Miami-Dade County, Florida. It owns five (5) for-hire licenses in Miami-Dade County. It is otherwise *sui juris*.

5. Defendant, MDC is a political subdivision of the State of Florida.

## JURISDICTION & VENUE

6. This Court has jurisdiction pursuant to Florida Statute § 26.012.

7. Pursuant to Florida Statute §§ 47.011 and 47.041, venue is proper in the Eleventh Judicial Circuit in and for Miami-Dade County Florida because the Defendant is a political subdivision of Florida located in Miami-Dade County, Florida.

## INTRODUCTION

8. Thomas Jefferson once wrote that "[t]he true foundation of republican government is the equal right of every citizen in his person and property, and in their management." Drawing from these lines, both the United States Constitution and the Florida Constitution have specific provisions regarding the right to acquire, possess, and protect property.

2

9.  Similarly, both the United States and Florida Constitutions contain protections against discriminatory and damaging treatment among substantially similar entities in the form of the Equal Protection claims.

10. In this sense, the laws regulating our American democracy specifically emphasize that certain rights of the individual are inalienable, such as the right to own maintain property. Therefore, such rights automatically engender the ability for protection against incursions not only by private actors, but the State as well.

11. Plaintiffs bring this Class Action Complaint challenging the unlawful and disparate treatment that will be given by MDC to Rasier, LLC/ Uber Technologies, Inc. ("UBER") and Lyft, Inc. ("LYFT") (referred to collectively herein as the "TNC's"), as a result of the County's approval of the ordinance relieving the TNC's of the obligation to comply with various Miami-Dade County ordinances relating to performing for-hire transportation services within Miami-Dade County (the "Ordinance"). The Ordinance includes MDCCO § 31-77, and Article VII of Chapter 31 of the MDCCO, specifically sections § 31-701 through § 31-713.

12. Plaintiffs bring this suit on behalf of themselves and seek to represent the following putative class:

   a.  All persons or entities holding for-hire licenses in Miami-Dade County pursuant to Chapter 31 of the MDCCO.

## GENERAL ALLEGATIONS

### A. DEFINITIONS.

13. The MDCCO defines "for-hire" as "driving, operating, or managing a for-hire passenger motor vehicle . . . ." in Miami-Dade County. MIAMI-DADE COUNTY, FL, Code § 31-81(r) (2015).

14. The MDCCO defines a "chauffeur" as "a duly licensed driver registered with and authorized by the Miami-Dade County Consumer Services Department ("CSD") to operate a for-hire passenger motor vehicle." *Id.* at § 31-81(d).

15. The MDCCO defines a "chauffeur's agreement" as "the CSD approved form agreements entered into by the chauffeur and the passenger service company and the chauffeur and the for-hire license holder prior to the provision of any for-hire service." *Id.* at § 31-81(e).

16. The MDCCO defines "passenger service company" as a " . . . Florida corporation or partnership created for the purpose of providing passenger services for for-hire taxi operations and providing various services to for-hire license holder(s) and chauffeurs with whom the passenger service company has entered into passenger service agreements." *Id.* at § 31-81(s).

17. A passenger service company's functions are defined in Chapter 31 of the MDCCO, and consist of:

> [P]roviding for-hire vehicle color schemes and markings; providing two-way radio or cellular telephone dispatch services, maintenance and advertising of a telephone number for receiving all calls related to for-hire taxi services; handling passenger complaints and passenger lost and found; [and maintaining] a properly listed telephone for receiving all calls relating to for-hire vehicle service.

> *See id.* at § 31-100(b).

18. The MDCCO defines a "passenger service agreement" as ". . . the CSD approved form agreement entered into by the for-hire license holder and the passenger service company prior to any for-hire operation." *See id.* at § 31-81(x).

19. In Miami-Dade County, a passenger service company must:

   a. Have a passenger service agreement with each individual for-hire license holder or entity for each for-hire vehicle it operates; [1] and

   b. Have a chauffer's agreement with each chauffeur who operates or drives a for-hire vehicle for which the passenger service company provides passenger services.[2]

## B. OPERATION AND REGULATION OF FOR-HIRE TRANSPORTATION SERVICES AND PASSENGER SERVICE COMPANIES IN MIAMI-DADE COUNTY.

20. Originally subject to inconsistent oversight from cities and localities in South Florida, the for-hire transportation industry became uniformly regulated by Miami-Dade County in 1981.

21. Today, all regulations relevant to for-hire transportation in Miami-Dade County are contained in Chapter 31 of the MDCCO and industry oversight is conducted by the Department of Regulatory and Economic Resources ("DRER"), which comprises what was formerly known as the CSD. Chapter 31 is enforced by DRER personnel, police forces of various municipalities in Miami-Dade County, and by the Miami-Dade Police Department.

---

[1] *Id.* at § 31-100(e)(3) (2014).

[2] *Id.* at § 31-100(e)(4).

22. The for-hire transportation industry in Miami-Dade County operates under the "medallion" system. Miami-Dade County explicitly created intangible property in the holder of a for-hire license, as the MDCCO states that the "[m]edallion [s]ystem . . . deems a taxicab for-hire license to be **intangible property**." *See id. at* § 31-81(aa) (emphasis added).

23. The MDCCO defines "for-hire" as "driving, operating, or managing a for-hire passenger motor vehicle" in Miami-Dade County. *See id. at* § 31-81(r).

24. In Miami-Dade County, the terms "medallion" and "for-hire license" are interchangeable.

25. The MDCCO defines a "for-hire license" as "an annual, renewable license . . . which authorizes the provision of for-hire transportation services and which may expire, be suspended or revoked." *See id.* at § 31-81(q).

26. Plaintiffs and members of the putative class are authorized and regulated for-hire license holders in Miami-Dade County.

27. The total amount of for-hire licenses in Miami-Dade County are limited, and a few new for-hire licenses are occasionally auctioned off in a lottery pursuant to an established formula created by Miami-Dade County officials.

28. In Miami-Dade County, for-hire transportation services may be performed:

    a. By a for-hire license holder him/herself as a chauffeur;[3] or

    b. Through a passenger service company.[4]

29. For-hire license holders in Miami-Dade County, whether an individual or an entity, must comply with regulations including, but not limited to:

    a. A for-hire license/medallion for each vehicle;[5]

---

[3] *Id.* at § 31-82(j)(7).

[4] *Id.* at § 31-82(j)(4).

    b.  Submission to regular background checks;[6]

    c.  Possession of approved automobile insurance secured from a member of the Florida Insurance Guarantee Association;[7]

    d.  Passing regular vehicle inspections;[8]

    e.  Possession of a chauffeur's registration license for each driver;[9]

    f.  Possession of a passenger service company license, if applicable;[10]

    g.  Adherence to established fare payment rates;[11]

    h.  If the for-hire vehicle is wheelchair accessible, proper training and certification in the safe and proper methods of securing, transporting, and dealing with the passengers utilizing a wheelchair;[12]

30. Miami-Dade County currently explicitly forbids the operation of for-hire vehicles without for-hire licenses, stating that:

> **It shall be unlawful** for any person to use, drive or operate, or to advertise in any newspaper, airwave transmission, telephone directory or other medium accessible to the public that it offers for-hire services, or to cause or permit any other person to use, drive or operate any for-hire motor vehicle upon the streets of Miami-Dade County **without first obtaining a Miami-Dade County for-hire license** . . .

*Id.* at § 31-82(a) (emphasis added).

31. The MDCCO defines "passenger service company" as a "Florida corporation or partnership created for the purpose of providing passenger services for for-hire taxi

---

[5] *See id.* at § 31-82(a); *see also id.* at § 31-82(f).
[6] *Id.* at § 31-82(d).
[7] *Id.* at § 31-88.
[8] *Id.* at § 31-82(e)(4).
[9] *Id.* at § 31-82(h)(13).
[10] *Id.* at § 31-81(j)(4).
[11] *Id.* at § 31-87(b).
[12] *Id.* at § 31-82 (j)(16).

operations and providing various services to for-hire license holder(s) and chauffeurs with whom the passenger service company has entered into passenger service agreements." *See id.* at § 31-81(s).

32. Miami-Dade County also strictly and explicitly forbids the operation of a passenger service company without authorization from a for-hire license holder, stating that "No person or entity shall provide taxicab passenger services on behalf of a for-hire license holder without such person or entity first obtaining a Miami-Dade County Passenger Service Company registration." *Id.* at § 31-100(a).

33. A passenger service company's functions are defined in Chapter 31 of the MDCCO, and consist of:

> [P]roviding for-hire vehicle color schemes and markings; providing two-way radio or cellular telephone dispatch services, maintenance and advertising of a telephone number for receiving all calls related to for-hire taxi services; handling passenger complaints and passenger lost and found; [and maintaining] a properly listed telephone for receiving all calls relating to for-hire vehicle service.

*See id.* at § 31-100(b).

34. To legally operate in Miami-Dade County as a passenger service company, an entity must comply with MDCCO requirements including, but not limited to:

    a.  Securing individual written passenger service agreements with individual for-hire license holders for each vehicle operated by the passenger service company;[13]

    b.  Securing of chauffeur's agreements with each chauffeur who operates or drives a for-hire vehicle for the passenger service company; [14]

---

[13] *Id.* at § 31-100(i).

c.  Payment of a registration fee;[15]

d.  Ensuring that each vehicle it operates, or allows to be operated, is insured by a member of the Florida Insurance Guarantee Association;[16]

e.  Maintaining a quality assurance program including regular training for all affiliated chauffeurs;[17]

f.  Providing a radio or cellular telephone dispatch system.[18]

35. Chapter 31 of the MDCCO was/is implemented to protect the health, welfare, and safety of the public. These requirements serve a reasonable and rational public policy basis as follows:

a.  Issuance of chauffeur's registration licenses requires all drivers to submit their personal information for a criminal background check conducted by Miami-Dade County and to a medical examination, all in the interest of ensuring the public of consistent standards of professional service. *See id.* at § 31-82(d). As an additional safety measure, chauffeur's licenses are required to be prominently displayed on the dashboard of all for-hire vehicles thereby providing the public with easy access to the name and all other pertinent information of the driver. *See id.* at § 31-303(i)(1).

b.  Licensing of passenger service companies and for-hire license holders assures the public of minimum responsible corporate and individual standards, including appropriate complaint systems and lost-and-found

---

[14] *Id.* at § 31-100(e)(3).
[15] *Id.* at § 31-100(e)(1).
[16] *Id.* at § 31-100(e)(2).
[17] *Id.* at § 31-100(e)(4).
[18] *Id.* at § 31-100(e)(5).

procedures such that an individual can have immediate redress in the event of loss or injury.

c.  All for-hire vehicles are required to be inspected regularly by the CSD to assure that the vehicles meet minimum safety standards, including, but not limited to, working windshield wipers, functional safety belts, functioning air conditioning, functioning windows and door locks, properly inflated tires, etc. *See id.* at § 31-89(d); *see also id.* at § 31-82(f); *see also id.* at § 31-89(a)(1)-(25).

d.  All for-hire vehicles are required to carry insurance coverage through an insurance company that is a member of the Florida Insurance Guaranty Association ("FIGA") to guarantee that all individuals who are injured as a result of the for-hire operations will be properly compensated even if the insurer becomes insolvent. FIGA will pay the injured party in such an event. Further, Miami-Dade County requires the named insured's to be the passenger service company, the for-hire license holder, the vehicle owner, and the chauffeur, for all activities, thereby eliminating coverage loopholes for the benefit of the public. *See id.* At § 31-88(a).

e.  An established fare schedule including meter rates and/or flat rates provides the riding public with full disclosure and knowledge of the approximate cost of each ride. *Id.* at § 31-86(a). These measures protect the public from unanticipated surge pricing and price-gouging.

36. Since Plaintiffs and members of the putative class are authorized for-hire license holders in Miami-Dade County, members of the riding public can hail one of the Plaintiffs' or

putative class member's authorized for-hire vehicles on the street, use a cell-phone to summon a ride either telephonically or through an internet-based smartphone application such as Way2Ride, or go online to arrange travel via a website.

37. Although the members of the riding public never exchange formal written contracts with authorized for-hire license holders, members of the riding public do enter into de-facto contracts and business relationships, whereby the customer is transported to a desired location and, in exchange, agrees to pay the published rate for the trip.

## C. MIAMI-DADE COUNTY'S ENDORSEMENT OF PLAINTIFFS PROPERTY RIGHTS

38. In addition to deeming the Plaintiffs' for-hire licenses to be intangible property, MDC provided through the MDCCO that the provision of for-hire transportation would be restricted specifically to for-hire license holders, and limited the issuance of new for-hire licenses.

39. In so doing, MDC allowed a secondary market wherein the for-hire licenses were traded for value, to form. MDC reaped the benefits of this secondary market in 2012, when it auctioned off several regular for-hire licenses and each of them were sold for amounts well in excess of $400,000.

40. Moreover, upon information and belief, numerous members of the Miami-Dade County Board of County Commissioners have gone on record to assure Plaintiffs and members of the putative class of the protectable property rights that they possess.

41. All for-hire licenses are eligible to be resold, or are capable of lapsing, and upon information and belief, the secondary fair market value of a for-hire license in January of 2014 was approximately $340,000.00.

## D. UBER AND LYFT BEGIN OPERATING IN MIAMI-DADE COUNTY.

42. UBER and LYFT both have principal places of business and operate out of San
    Francisco, California. Both TNCs have histories of entering particular cities or counties
    and attempting to obtain special treatment so that they need not comply with pesky local
    and/or state regulations with which its competitors must comply.

43. The TNCs are **passenger service companies** within the meaning of the MDCCO, who
    hire drivers to provide for-hire transportation services to consumers through the use of a
    smartphone application, and who receive a portion of all profits rendered by said drivers.

44. The TNCs utilize their smartphone applications as a means to dispatch their drivers to
    customers through internet communications.

45. When using UBER or LYFT, members of the public enter into contracts and business
    relationships through smartphone apps whereby they locate, schedule and summon
    UBER or LYFT drivers, who then conduct for-hire transportation services for the
    member of the public by transporting them to a desired location in exchange for credit
    card payments through the smartphone apps. On certain occasions, including times of
    high volume or inclement weather, these fares can be doubled, tripled or multiplied
    exponentially by what is known as surcharge pricing.  Once the payment is made,
    depending on the service used, UBER or LYFT, then take a share of the fare, and remit
    the remaining percentage back to the driver.

46. Despite full knowledge that Miami-Dade County required individual for-hire licenses for
    each automobile that a passenger service company used to conduct for-hire transportation
    services, when the TNCs originally entered the market in approximately June of 2014
    they intentionally failed to secure for-hire licenses. passenger service agreements and/or

12

chauffeur's agreements and began operations in Miami-Dade County as a passenger service company.

47. Miami-Dade County responded to the TNCs arrival by ticketing their drivers, and by impounding both UBER and LYFT vehicles.

48. Numerous citations reflecting the fact that the TNCs were not in compliance with Chapter 31 of the MDCCO have been issued against the TNCs since they began operating in Miami-Dade County.

49. Upon information and belief, the TNCs have reimbursed their drivers for fines associated with violations of MDCCO, and have also agreed to provide drivers with legal representation for all potential violations in Miami-Dade County.[19]

50. The TNCs never made any attempts to comply with any applicable regulations regarding passenger service companies in Miami-Dade County.

51. Instead, upon information and belief, the unauthorized and illegal for-hire operations have always been a part of the both UBER and LYFT's express business plan. In response to ticketing from Miami-Dade County, LYFT representatives have been quoted as saying:

> We have received reports that local Lyft drivers have recently received citations in Miami. In all cases, we have responded immediately to provide support and we are also covering the cost of the citations and any necessary legal assistance. Throughout this process, we commit to standing strong with drivers and passengers every step of the way, fighting any citations, covering relevant costs, and making **policy progress**.[20]

---

[19] Camila Souza, Fines Won't Keep Uber and Lyft Down in Miami, TECH COCKTAIL MIAMI (June 6, 2014) http://tech.co/uber-lyft-miami-fines-2014-06.
[20] *Id.* (emphasis added.)

52. The unauthorized and illegal for-hire transportation service operations by the TNCs in Miami-Dade County have diluted the for-hire transportation market in Miami-Dade County and thereby significantly devalued the for-hire licenses held by the Plaintiffs and putative class. As a direct result, the actions of the TNCs inflicted extensive damages upon the Plaintiffs and putative class prior to MDC's legislative activity to regulate UBER and LYFT.

### E.  MIAMI-DADE COUNTY GIVES UBER AND LYFT CARTE BLANCHE

53. Upon information and belief, for a period beginning prior to the official operational entrance of the TNCs into the Miami-Dade County for-hire transportation market and continuing to date, the TNCs have lobbied the Miami-Dade County Board of County Commissioners and Mayor Carlos Giminez aggressively for special treatment so that it need not be forced to comply with applicable local and state regulations with which its direct competitors, the taxi industry, must comply with.

54. Recently, the Miami-Dade County Board of County Commissioners indicated their intention to pass the Ordinance, which would allow the TNCs to operate within their own classification of law, despite the fact that they are already operating as passenger service companies, dispatching drivers who provide for-hire transportation without for-hire licenses, the effect of which has been and will continue to be the flooding the Miami-Dade County for-hire market and destruction of the for-hire licenses owned by the Plaintiffs and the putative class.

55. Despite the fact that there are no discernible differences between the Plaintiffs and the putative class and the TNCs, upon passage of the Ordinance, MDC will effectively

choose to regulate the two groups in markedly different ways, with the rules and ordinances applying to the TNCs being markedly more advantageous. Specifically:

    a.  MDCCO § 31-100(i) requires passenger service companies to secure individual written passenger service agreements with individual for-hire license holders for each vehicle operated by the passenger service company, whereas TNCs are subject to no such requirement.

    b.  MDCCO § 31-100(e)(3) requires passenger service companies to secure chauffeur's agreements with each chauffeur who operates or drives a for-hire vehicle for the passenger service company; conversely, TNCs are granted a much wider birth and simply must not "authorize any individual [to drive for the TNC] that has been denied a chauffeur's registration in Miami-Dade County. MDCCO § 31-702(q)(6).

    c.  MDCCO § 31-88(a)-(b), as well as § 31-100(e)(2), requires that each for-hire vehicle operated by a passenger service company, or which it allows to be operated, is insured by a member of the Florida Insurance Guarantee Association, and additionally requires that insurance certificates for each for-hire vehicle regulated pursuant to a for-hire license must be filed with the DRER, and that each such vehicle must have insurance that offers limits of liability of at least $50,000.00 per person, $100,000.00 per occurrence of bodily injury, and $200,000.00 for each occurrence of property damage. Conversely, pursuant to the new regulations and specifically MDCCO § 31-707, TNCs face no such requirement of procuring insurance guaranteed by the Florida Insurance Guarantee

Association, TNCs can file a blanket statement certifying compliance with all applicable insurance laws for all of vehicles that the TNC operates, and there are no explicit minimum limits of liability, except that TNCs are required to file a certificate "demonstrating compliance with Florida insurance laws." *Id.* at MDCCO § 31-707.

d.  Pursuant to MDCCO § 31-82(d), the DRER itself investigates each application for a for-hire license, ensuring that the user has not misrepresented or concealed facts, that the applicant has not pled *nolo contendre* or guilty to any crimes in the last five years, and that the applicant is authorized to work in the United States; conversely, the new regulations as they apply to TNCs impose no such hurdles, as TNCs are allowed to independently conduct their own background checks. MDCCO § 31-702(q).

e.  Pursuant to MDCCO § 31-89, vehicles operating pursuant to for-hire licenses must be inspected by the DRER. The MDCCO expressly limits the age of said vehicles to six (6) model years, and requires that vehicles one (1) – two (2) model years in age be inspected annually, three (3) – four (4) model years in age be inspected semi-annually, and five (5) model years of age or more to be inspected quarterly. Conversely, pursuant to MDCCO § 31-708, TNCs are allowed to take their vehicles to independent places of inspection, where the TNC provider can allow a "mechanic or automobile technician" to fill out a pre-provided inspection form. Additionally, TNCs are allowed to have vehicles of up to ten (10) model

16

years in age, and the Ordinance contains no required intervals of inspection.

    f.   Pursuant to MDCCO § 31-87, the rates for for-hire transportation provided pursuant to a for-hire license are set by the Board of County Commissioners of Miami-Dade County, and the director of the DRER can (and currently does) impose surcharges of over $2.00. Conversely, MDCCO 31-706 states that TNCs "may establish and charge fares for transportation services based on distance traveled and/or time elapsed during service, a flat prearranged rate or a suggested donation . . ."

56. In essence, MDC has given the TNCs carte blanche to operate in whatever fashion they deem fit, with no accountability or oversight, whereas the Plaintiffs and members of the putative class are subject to onerous, expensive and time and energy consuming regulations.

57. Moreover, the effect of regulating the TNCs is to legalize, upon information and belief, upwards of ten thousand for-hire transportation providers in Miami-Dade County, and to thereby remove any and all disincentives or barriers to the increasing dilution of the for-hire transportation market in same. This has significantly impaired the value of the intangible property held by the Plaintiffs and the putative class and will continue to do so for the foreseeable future.

## CLASS ALLEGATIONS

### A.    CLASS DEFINITIONS

58. Pursuant to Fla. Stat. § 1.220(b)(1)(B) and 1.220(b)(3), Plaintiffs bring this claim on behalf of all persons or entities holding for-hire licenses in Miami-Dade County pursuant to Chapter 31 of the MDCCO.

59. Excluded from the putative class are the Defendant MDC, its employees, agents, contractors, co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and judicial officers and their immediate family members and associated court staff assigned to this case.

60. Plaintiffs and the putative class reserve the right to modify or amend the definition of the proposed putative class before the Court determines whether certification is appropriate.

61. Plaintiffs' and the putative class's claims are appropriate for class-wide treatment because Plaintiffs' and the putative class can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

### B.    NUMEROSITY

62. Members of the putative class are so numerous that joinder of all members would be impracticable. On information and belief, there are over 500 for-hire license holders in Miami-Dade County, Florida. The individual class members are also ascertainable, as the names and addresses of all class members can be identified in public records. Plaintiffs and the putative class do not anticipate any difficulties in the management of the action as a class action.

## C.    COMMONALITY

63. There are questions of law and fact that are common to all claims of Plaintiffs and the
putative class. Among such questions of law and fact are the following:

    a.  Would MDC's passage of the Ordinance devalue the for-hire licenses, deemed to
be intangible property by the MDCCO, owned by Plaintiffs and members of the
putative class?;

    b.  By how much would MDC's passage of the Ordinance devalue the for-hire
licenses, deemed to be intangible property by the MDCCO, which are held by the
Plaintiffs and the putative class?;

    c.  Whether the Plaintiffs and members of the putative class are substantially similar
entities in their form and function?;

    d.  Whether MDC's passage of the Ordinance would discriminate against the
Plaintiffs in favor of the TNCs?;

    e.  What was the fair market value of a for-hire license when UBER began operating
in Miami-Dade County?;

    f.  What was the fair market value of a for-hire license when LYFT began operating
in Miami-Dade County?;

    g.  What is the affect of the passage of the Ordinance on the value of the for-hire
licenses, deemed to be intangible property by Chapter 31 of the MDCCO, that are
owned by Plaintiffs and members of the putative class?'

    h.  When did UBER begin operating in Miami-Dade County?;

    i.  When did LYFT begin operating in Miami-Dade County?

**D.    TYPICALITY**

64. Plaintiffs' claims are typical of the claims of the putative class members because proving the claims of one for-hire license holder will prove the claims of the entire putative class. The same evidence and legal rulings necessary to support the Plaintiffs' claims will necessarily establish the claims of the entire putative class.

65. Plaintiffs are members of the class they seek to represent, and their claims are typical of the respective putative class's claims because of the similarity, uniformity, and common purpose of Defendant's unlawful conduct. Each member of the putative class has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of the Defendants' wrongful conduct.

**E.    ADEQUACY OF REPRESENTATION**

66. Plaintiffs' and the putative class are adequate representatives of the class they seek to represent and will fairly and adequately protect the interests of such class. Plaintiffs and the putative class are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them. There is no divergence of interest between Plaintiffs and the putative class members. Plaintiffs and their counsel anticipate no difficulty in the management of this litigation as a class action.

67. To prosecute this case, Plaintiffs and the putative class have chosen the undersigned law firm, which is experienced in this type of litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

F. **PREDOMINANCE**

68. MDC has acted and/or refused to act on grounds that are generally applicable all members of the putative class, and final declaratory relief concerning the class as a whole is therefore appropriate.

69. The questions of law or fact common to the Plaintiffs' and the putative class's claims predominate over any individual questions of law or fact.

70. Because this lawsuit is grounded on MDC's passage of the Ordinance will affect the Plaintiffs and members of the putative class equally, the only conceivable individual issues pertain to damages. It is well established that individual damages questions are not relevant to a predominance analysis.

i. **SUPERIORITY**

71. A class action on behalf of the Plaintiffs and the putative class is superior to individual actions in part because of the non-exhaustive factors listed below:

    a. Joinder of all putative class members would create extreme hardship and inconvenience for the affected for-hire license holders as they are extremely numerous and reside in different areas of Miami-Dade County;

    b. There are no known individual members of the putative class who are interested in individually controlling the prosecution of separate actions;

    c. The interests of justice will be well served by resolving the common disputes of potential members of the putative class in one forum;

    d. Individual suits would not be cost effective or economically maintainable as individual actions;

    e.   Individual suits would be difficult to manage because common legal rulings could not be applied to each individual suit; and

    f.   The action is manageable as a class action.

### COUNT I – VIOLATION OF RIGHT TO EQUAL PROTECTION

72. Plaintiffs re-allege and incorporate herein all of the allegations contained in paragraphs one (1) through seventy-one (71).

73. Plaintiffs have a right to equal protection under the law pursuant to the Fourteenth Amendment to the United States Constitution (through 42 U.S.C. § 1983) and Article I, Section 2 of the Florida Constitution.

74. MDCs enactment of the Ordinance will be an abridgment of the Plaintiffs' right to equal protection of the laws.

75. The Ordinance, on its face and as applied, is unconstitutional because it treats Plaintiffs on less than equal terms than it treats the TNCs. TNCs and Plaintiffs are similarly situated entities that provide for-hire services to consumers in Miami-Dade County.

76. Notably, in that both the Plaintiffs and putative class and TNCs provide transportation in exchange for compensation, MDC itself acknowledges that the Plaintiffs and putative class is similarly situated to the TNCs, as MDCCO § 31-77 states that "for-hire means any vehicle driven by a person which engages in the transportation of persons and their accompanying property for compensation over the public streets."

77. Despite this fact, if the Ordinance is passed, MDC will have agreed to waive rules, laws, and codes for the TNCs that remain in full force and effect as to the Plaintiffs.

78. In so doing, MDC will have intentionally chosen to carve out an exception to laws that would otherwise apply to the TNCs in favor of creating new, special and less onerous laws, the effect of which is to discriminate against Plaintiffs in favor of the TNCs.

79. MDC's decision to do so will not be rationally related to legitimate governmental interests. Instead, the decision to enact the Ordinance will be irrational and wholly arbitrary, and made in order to avoid a legal and public relations battle with the TNCs, which may erupt if MDC attempts to enforce the rules, laws and codes applicable to both Plaintiffs and the TNCs.

80. As a direct and proximate result of MDC's violation of denial guaranteed by both the United States Constitution and Florida Constitution, Plaintiffs have in the past and will continue to suffer in the future direct and consequential damages.

WHEREFORE, Plaintiffs seek a judgment against MDC for direct damages, consequential damages, interest, costs and for such other and further relief as this Court deems appropriate.

## COUNT II – DECLARATORY JUDGMENT

81. Plaintiffs re-allege and incorporate herein all of the allegations contained in paragraphs one (1) through seventy-one (71).

82. Given the aforementioned conduct and allegations, Plaintiffs seek a declaration that the Ordinance will violate their right to equal protection of the law, and therefore that the Ordinance is unconstitutional and unenforceable.

83. Additionally, Plaintiffs also seek a declaration that the TNCs are operating as passenger service companies within the meaning of the regulations of Chapter 31 of the MDCCO.

84. Defendant's actions are ongoing, and there is a bona fide, actual and present need for such a declaration.

WHEREFORE, Plaintiffs seek a declaration that the Ordinance violates their right to equal protection of the law, and therefore that it is unconstitutional and unenforceable, and a declaration that the TNCs are operating as if they are passenger service companies within the meaning of Chapter 31 of the MDCCO, and that they are therefore required to comply with all laws, codes and rules applicable to Plaintiffs.

### COUNT III – INJUNCTIVE RELIEF

85. Plaintiffs re-allege and incorporate herein all of the allegations contained in paragraphs one (1) through seventy-one (71).

86. As stated above, the Ordinance will violate the Plaintiffs' right to equal protection of the laws, and therefore that it is unconstitutional and unenforceable.

87. Absent injunctive relief from this Court, Plaintiffs will suffer irreparable harm, as a result of the significant devaluation of their for-hire licenses, which have been deemed to be intangible property.

88. There is no adequate remedy at law that may serve to prohibit MDC from carving out exceptions to all the laws, codes and rules applicable to the Plaintiffs in favor of the TNCs.

89. The threatened injury to the Class outweighs any injury to MDC, and the granting of this injunction will serve the public interest.

WHEREFORE, the Plaintiffs seek entry of the following Orders:

   a.    That the Court, after notice of hearing, issue a temporary injunction against the Defendant MDC, enjoining it from enforcing the Ordinance.

b.   That the Court, after a trial on the merits, issue a permanent injunction against the Defendant MDC, enjoining it from enforcing the Ordinance.

**c.**   All other relief this court deems just and proper.

### COUNT IV – INVERSE CONDEMNATION

90. Plaintiffs re-allege and incorporate herein all of the allegations contained in paragraphs one (1) through seventy-one (71).

91. Plaintiffs and other members of the putative class are United States Citizens owning property in Miami-Dade County, Florida and are thereby entitled to the protection of the laws of the United States and the State of Florida, specifically including:

   a.   Amendment V to the United States Constitution;

   b.   Article X, Section 6(a) of the Constitution of the State of Florida; and

   c.   Section 120.68 of the Florida Statutes.

92. The constitutional guarantees cited herein protect private property owners from suffering government to take their private property without payment of just or full compensation therefore.

93. Through the Ordinance, MDC will substantially interfere with the private property held by the Plaintiffs in that their for-hire licenses will be significantly devalued as a result of the legalization and/or regulation of the TNCs.

94. MDC's actions will not substantially advance a legitimate state interest.

95. MDC has never made any offer to Plaintiffs to purchase their property, or any part thereof or interest therein, or to pay damages for the taking that MDC has effectuated, nor has MDC instituted eminent domain proceedings to acquire it, or any part thereof or interest therein. Therefore, MDC is in violation of:

a. Amendment V to the United States Constitution; and

b. Article X, Section 6(a) of the Constitution of the State of Florida.

96. For as long as the TNCs continue to operate in Miami-Dade County, the damages and

injuries herein complained of are present, permanent and continuing in their impact.

WHEREFORE, the Plaintiffs on behalf of themselves and all other similarly situated

respectfully request that this Court determine the amount of damages, including the just and full

compensation for the taking that Plaintiffs and other members of the putative class have suffered

as a result of the Defendant's actions, and award same as well as such other and further relief as

this Court deems appropriate.

**DATED:** February 22, 2016

Respectfully submitted,

**PATINO & ASSOCIATES, P.A.**
*Attorneys for the Plaintiffs*
550 Biltmore Way, Suite 740
Coral Gables, Florida 33134
T: (305) 443-6163
F: (305) 443-5635
service@patinolaw.com

By:     ___/s Ralph G. Patino_____.
        **RALPH G. PATINO, ESQ.**
        Florida Bar No. 768881

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN
AND FOR MIAMI-DADE COUNTY
FLORIDA

MIADECO CORP., a Florida Corporation, B &
S TAXI CORP., a Florida Corporation, and
CHECKER CAB OPERATORS, INC., a
Florida Corporation, individually and on behalf
of others similarly situated,

                                Plaintiff,

vs.

              Complex Business Litigation Section (40)
              Case No. 16-4244

MIAMI-DADE COUNTY, a political
subdivision of the State of Florida,

                              Defendant.
_____/

## ORDER REQUIRING COMPLIANCE WITH
## COMPLEX BUSINESS LITIGATION SECTION PROCEDURES

### AND

### NOTICE OF HEARING AND ORDER ON CASE MANAGEMENT CONFERENCE

      **WHEREAS**, the Complex Business Litigation Procedures shall apply to all actions in the

Complex Business Litigation Section and Fla. R. Civ. P. 1.201 Complex Litigation, except to the

extent that, in any particular action, they are superseded by an Order.

      **WHEREAS,** the Complex Business Litigation Procedures are designed to facilitate the

proceedings of cases in the Eleventh Judicial Circuit Complex Business Litigation Section; to

promote transmission and access to case information by the Court, litigants, counsel, and the

public; and to facilitate the efficient and effective presentation of evidence in the courtroom.

1

These Procedures shall be construed and enforced to avoid technical delay, **encourage civility**, permit just and prompt determination of all proceedings, and promote the efficient administration of justice.

**NOTICE IS HEREBY GIVEN** that all outstanding and future motions pertaining to cases within the Complex Business Litigation Section must adhere to Complex Business Litigation Section Procedures, which are available at the court's website: http://www.jud11.flcourts.org

**NOTICE IS HEREBY GIVEN** that on **June 3, 2016** at **9:00am** in Courtroom 10-1, of the Miami-Dade County Courthouse, 73 West Flagler Street, Miami, Florida, undersigned shall convene a Case Management Conference ("CMC") in this cause.

**The Parties are ordered to provide courtesy copies of <u>all</u> motions and where required, memoranda, oppositions and replies, pertaining thereto, hereinafter filed in this case, to the undersigned Judge through 1) eCourtesy submission, (see directions on Judge Thornton's webpage at www.jud11.flcourts.org), and 2) separately to the division's document library at cbl@jud11.flcourts.org.   Submission to the document library is mandatory.  Failure to provide a copy of materials to the library may result in a matter not being addressed.**

**Unobjected to or uncontested discovery materials need not be filed with the document library, e.g., notice of depositions, requests for copies, production, admissions, interrogatories.**

**Hard copies need not be delivered unless requested by chambers.  All e-mails must comply with the Florida Rules of Civil Procedure regarding email submissions.**

Orders, agreed and otherwise, shall be submitted to Judge Thornton by eCourtesy as indicated on his webpage

Plaintiff is required to provide a full set of all documents regarding pending motion(s), including all responses and replies, and all memoranda no later than two (2) weeks prior to the initially scheduled CMC. MOTIONS FILED WITHOUT COURTESY COPIES MAY NOT BE CONSIDERED..

Counsel for Plaintiff(s) and Third Party Plaintiff(s) is/are ORDERED to confirm all parties subsequently named or appearing herein have been served copies of this Notice and Order.  If any subsequently served or named party has not been served with a copy of this notice, Plaintiff and Third Party Plaintiff shall provide the party with a copy of this Notice.

Trial Counsel and their clients shall appear in person for the CMC unless other arrangements are approved in advance by Judge Thornton.  Other options include appearance by videoconference or by telephone where appropriate.  Requests should be made by motion and indicate what circumstances interfere with live attendance.[1]  Failure of any party to attend, including the insurance carrier representative, shall subject that party to sanctions and/or fees.  Regardless of the pendency of any undecided motions, Trial Counsel shall meet no less than 30 days in advance of the CMC and address the following which will be included in the Joint Case Management Report, along with other appropriate topics, including those set forth in Fla. R. Civ. P. 1.201(b) Complex Litigation, some of which subjects and topics will be incorporated into a Case Management Order:

1. The name of lead trial counsel for each party, and the name of any unrepresented party;

2. A brief factual statement of the case;

---

[1] A representative of the insurance carrier for any insured party who is **not** such carrier's outside counsel and who has decision making authority without further consultation shall attend.

3.  Pleading issues, including service of process, venue, joinder of additional parties, theories of liability, damages claimed and applicable defenses;

4.  The identity and number of any motions to dismiss or other preliminary or pre-discovery motions which have been filed and the time period in which they shall be filed, briefed and argued;

5.  A discovery plan and schedule including the length of the discovery period, the anticipated number of fact and expert depositions to be permitted and, as appropriate, the length and sequence of such depositions;

6.  A description of pertinent documents and a list of fact witnesses the parties believe to be relevant.

7.  Anticipated areas of any expert testimony, the number of experts to be called by each party, timing for identification of experts, and exchange of expert reports;

8.  An estimate of the volume of documents and computerized information likely to be the subject of discovery from parties and nonparties and whether there are technological means which may render document discovery more manageable at an acceptable cost, and the likelihood of discovery issues;

9.  The possibility of obtaining admissions of fact and voluntary exchange of documents and electronically stored information, stipulations regarding authenticity of documents, electronically stored information, and the need for advance rulings from the Court on admissibility of evidence.

10. The advisability of using the general magistrate for discovery purposes at no cost to the parties; and the advisability of using the general and/or a special magistrate(s) for fact finding, mediation, or discovery disputes or such other matters as the parties may agree upon;

11. The time period, after the close of discovery within which post-discovery dispositive

motions shall be filed, briefed and argued, and a tentative schedule for such activities;

12. The possibility of settlement and the timing of Alternative Dispute Resolution, including the selection of a mediator or arbitrator(s);

13. Whether or not a party or parties desire to use technologically advanced methods of presentation or court-reporting and, to the extent that this is the case, a determination of the following:

      (a) Fairness issues, including but not necessarily limited to use of such capabilities by some but not all of the parties and/or by parties whose resources permit or require variations in the use of such capabilities;

      (b) Issues related to compatibility of court and party facilities and equipment;

      (c) Issues related to the use of demonstrative exhibits and any balancing of relevance and potential prejudice which may need to occur in connection with such exhibits;

      (d) Such other issues related to the use of the Court's and parties' special technological facilities as may be raised by any party or the Court or its technological advisor, given the nature of the case and the resources of the parties.

14. A good faith estimate by counsel for each party based upon consultation with all of the parties of the costs and fees each party is likely to incur in pursuing the litigation through trial court adjudication;

15. A preliminary listing of the principal legal and factual issues which counsel believe will need to be decided in the case;

16. A preliminary listing of any legal principles and facts that are not in dispute;

17. A good faith estimate by counsel for each party of the length of time to try the case;

18. Whether a demand for jury trial has been made.

19. The approximate month and year the parties believe the case should be set for trial.

Within ten (10) days of the meeting among Trial Counsel, but no less than fourteen (14) days in advance of the Case Management Conference, the Parties shall file a Joint Case Management Report addressing the matters described in paragraphs 1 - 19 above and shall provide a courtesy copy to the Court as provided above.   The Court's e-mail address is cbl@jud11.flcourts.org

In addition, a copy should be submitted via **eCourtesy to Judge Thornton** no later than 14 days prior to the CMC addressed to the Court's special set calendar using the hearing date scheduled for the CMC.   **THE DEADLINES FOR SUBMISSIONS PRIOR TO THE INITIAL CMC MAY NOT BE ALTERED OR WAIVED BY COUNSEL.   PLEASE MAKE APPROPRIATE ARRANGEMENTS TO COMPLY.**

All counsel and parties are responsible for filing a Joint Case Management Report in full compliance with this Order. Plaintiff's counsel shall have the primary responsibility to coordinate the meeting of Lead Trial Counsel and unrepresented parties in person, and the filing of the Joint Case Management Report. If counsel is unable to coordinate such compliance, counsel shall timely notify the Court by written motion to be set and heard on motion calendar or request for a status conference. **Failure to provide the required case management report may subject the violating party(ies) to sanctions and/or fees.**

Pursuant to the provisions of Fla. R. Civ. P. 1.201(b)(3), and notwithstanding rule 1.440, at the initial case management conference, the Court will set the trial date or dates no sooner than 6 months and no later than 24 months from the date of the initial case management conference unless good cause is shown for an earlier or later setting. **As provided in the rule, continuance of the trial of a complex action will rarely be granted, and then only upon good cause shown.   THE COURT ANTICIPATES REAL TRIAL SETTINGS, AND COUNSEL**

**SHOULD MAKE APPROPRIATE SCHEDULING DECISIONS AT THE TIME OF THE**

**CMC.**

      If you are a person with a disability who needs any accommodation in order to participate

in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance.

Please contact Court's ADA Coordinator (305) 375-2006 within two (2) working days of your

receipt of this notice. If you are hearing or voice impaired, call (800) 955-8771.

      DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 03/25/16.

<br/>

JOHN W. THORNTON
CIRCUIT COURT JUDGE

ORIGINAL

JUDGE JOHN W. THORNTON JR.

> **No Further Judicial Action Required on THIS MOTION**
> **CLERK TO RECLOSE CASE IF POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter. The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed and stamped original Order sent to court file by Judge Thornton's staff.

to:

RPatino@patinolaw.com
Service@Patinolaw.com
RForrest@patinolaw.com

# PLEASE NOTE

CLIENTS (INCLUDING A REPRESENTATIVE OF ANY INSURANCE CARRIER AS DEFINED IN FLA. R. CIV. P. RULE 1.720(b)(3)) **MUST** ATTEND THE CASE MANAGEMENT CONFERENCE.

FAILURE TO COMPLY WITH THE NOTICE OF ADHERENCE AND ORDER ON CASE MANAGEMENT SHALL RESULT IN SANCTIONS AGAINST THE OFFENDING PARTY INCLUDING BUT NOT LIMITED TO THE ASSESSMENT OF COSTS AND ATTORNEY'S FEES.

MOTIONS FILED OF RECORD PRIOR TO ACTION BEING ASSIGNED TO COMPLEX LITIGATION MUST BE RE-FILED IN ACCORDANCE WITH CBL RULES WITH APPROPRIATE MEMORANDA. FAILURE TO RE-FILE WILL RESULT IN MOTION BEING DISREGARDED BY THE COURT.

COURTESY COPIES OF MATTERS TO BE ADDRESSED BY THE COURT SHALL BE SENT VIA EMAIL TO: cbl@jud11.flcourts.org AND TO OTHER APPLICABLE EMAIL ADDRESS ON JUDGE THORNTON'S JUDICIAL WEBSITE. FAILURE TO COMPLY MAY RESULT IN SANCTIONS BEING IMPOSED

## CBL WEBSITE: jud11.flcourts.org

8

RGP/bd
1516-002

MIADECO CORP., a Florida corporation,
B&S TAXI CORP., a Florida corporation
and CHECKER CAB OPERATORS, INC.,
a Florida corporation, individually and on
behalf of others similarly situated,

　　　　　Plaintiffs,

v.

MIAMI-DADE COUNTY, a political
Subdivision of the State of Florida,

　　　　　Defendant.
_____/

IN THE CIRCUIT COURT OF THE 11th [11th]
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

Complex Business Litigation Section (40)

CASE NO.: 16-4244

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that a hearing will be held before the Honorable John W. Thornton, one of the Judges of the above-styled Court, in Chambers, Room 1017 at the Dade County Courthouse, 73 W. Flagler Street, Miami, Florida 33130 on **Tuesday, April 19, 2016 at 9:30 am**, or as soon thereafter as Counsel can be heard on:

## STATUS CONFERENCE

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st [1st] Avenue, Suite 2702, Miami, FL 33128; ADA@jud11.flcourts.org; (305) 349-7175; Fax: (305) 349-7355, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

PATINO & ASSOCIATES, P.A.
*Counsel for the Plaintiff*
550 Biltmore Way, # 740, Coral Gables, FL 33134
Telephone: 305-443-6163/Facsimile: 305-443-5635
Email: service@patinolaw.com

By:　　/s/ *Ralph G. Patino*
　　　　RALPH G. PATINO, ESQ.
　　　　Florida Bar No. 768881

1516-003
RGP/RPF

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

MIADECO CORP., a Florida Corporation,
B & S TAXI CORP., a Florida
Corporation, and CHECKER CAB
OPERATORS, INC., a Florida
Corporation, individually and on behalf of
others similarly situated,

CASE NO.: 16-4244

**CLASS REPRESENTATION**

    Plaintiffs,

v.

MIAMI-DADE COUNTY, a political
subdivision of the State of Florida,

    Defendant.

_____/

## AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiffs, MIADECO CORP. ("MIADECO"), a Florida Corporation, B&S TAXI CORP. ("B&S"), a Florida Corporation, and CHECKER CAB OPERATORS, INC., a Florida Corporation, individually and on behalf of all others similarly situated (collectively, "Plaintiffs"), by their undersigned attorneys, hereby file suit against the Defendant, MIAMI-DADE COUNTY (the "County"), a political subdivision of the State of Florida, and allege as follows:

### THE PARTIES

1.    Plaintiffs are regular for-hire license owners. These licenses enable Plaintiffs to provide transportation in return for compensation in Miami-Dade County. Plaintiffs bring this class action, pursuant to 42 U.S.C. § 1983 and the United States and Florida Constitutions, on behalf of themselves and all other regular for-hire license holders in Miami-Dade County who are required to comply with all Miami-Dade County ordinances relating to the provision of for-hire transportation services.

2.    Plaintiff MIADECO is a Florida corporation with its principal place of business in Miami-Dade County, Florida. It owns one hundred-fifteen (115) for-hire licenses in Miami-Dade County. It is otherwise *sui juris*.

3.    Plaintiff B & S is a Florida corporation with its principal place of business in Miami-Dade County, Florida. It owns nineteen (19) for-hire licenses in Miami-Dade County. It is otherwise *sui juris*.

4.    Plaintiff CHECKER CAB OPERATORS, INC. is a Florida corporation with its principal place of business in Miami-Dade County, Florida. It owns five (5) for-hire licenses in Miami-Dade County. It is otherwise *sui juris*.

5.    Defendant County is a political subdivision of the State of Florida.

### JURISDICTION & VENUE

6.    This Court has jurisdiction pursuant to Florida Statute § 26.012.

7.    Pursuant to Florida Statutes §§ 47.011 and 47.041, venue is proper in the Eleventh Judicial Circuit in and for Miami-Dade County Florida because the Defendant is a political subdivision of Florida located in Miami-Dade County, Florida.

### INTRODUCTION

8.    Thomas Jefferson once wrote that "[t]he true foundation of republican government is the equal right of every citizen in his person and property, and in their management." Drawing from these lines, both the United States Constitution and the Florida Constitution have specific provisions regarding the right to acquire, possess, and protect property.

9.     Both the United States and Florida Constitutions also protect against discriminatory and damaging treatment among substantially similar entities under the Equal Protection clause.

10.    In this sense, the laws regulating our American democracy emphasize that certain rights of the individual are inalienable, such as the right to own and maintain property. Therefore, such rights automatically engender the ability for protection against incursions not only by private actors, but by the State and its subdivisions as well.

11.    Plaintiffs bring this Class Action Complaint challenging the unlawful and disparate treatment that has been given by the County to Rasier, LLC/Uber Technologies, Inc. ("UBER"), Lyft, Inc. ("LYFT"), and other similar entities (collectively, the "TNC's"), as a result of the County's approval of an ordinance relieving the TNC's of the obligation to comply with various provisions of the Miami-Dade County Code of Ordinances ("MDCCO") relating to performing for-hire transportation services within Miami-Dade County (the "Ordinance"). The Ordinance includes MDCCO § 31-77 through § 31-100, MDCCO § 8CC-10, and Article VII of Chapter 31 of the MDCCO, specifically sections § 31-701 through § 31-713. Plaintiffs also assert in this lawsuit that the County's approval of the Ordinance has resulted in an unlawful taking of their property and violates the Commerce Clause.

12.    Plaintiffs bring this suit on behalf of themselves and seek to represent the following putative class:

    a.  All persons or entities holding regular for-hire licenses in Miami-Dade County pursuant to Chapter 31 of the MDCCO.

3

## GENERAL ALLEGATIONS

### A. DEFINITIONS.

13.   The MDCCO defines "for-hire" as "driving, operating, or managing a for-hire passenger motor vehicle . . . ." in Miami-Dade County. MIAMI-DADE COUNTY, FL, Code § 31-81(q) (2015).

14.   The MDCCO defines a "chauffeur" as "a duly licensed driver registered with and authorized by the RER to operate a for-hire passenger motor vehicle." *Id.* at § 31-81(d).

15.   The MDCCO defines a "chauffeur's agreement" as "the CSD approved form agreements entered into by the chauffeur and the passenger service company and the chauffeur and the for-hire license holder prior to the provision of any for-hire service." *Id.* at § 31-81(e).

16.   The MDCCO defines "passenger service company" as a ". . . Florida corporation or partnership created for the purpose of providing passenger services to for-hire taxi operations and providing various services to for-hire license holders and chauffeurs." *Id.* at § 31-81(s).

17.   A passenger service company's functions are defined in Chapter 31 of the MDCCO, and consist of:

> [P]roviding for-hire vehicle color schemes and markings; providing dispatch services, maintenance and advertising of a telephone number for receiving all calls related to for-hire taxi services; handling passenger complaints and passenger lost and found; [and maintaining] a properly listed telephone for receiving all calls relating to for-hire vehicle service.

> *Id.* at § 31-100(b).

18. Pursuant to the MDCCO, "[n]o person or entity shall provide taxicab passenger services on behalf of a for-hire license holder without such person or entity first obtaining a Miami-Dade County passenger service company registration . . ." *Id.* at § 31-100 (a). Moreover, in Miami-Dade County, a passenger service company must have a chauffer's agreement with each chauffeur who operates or drives a for-hire vehicle for which the passenger service company provides passenger services.

**B. OPERATION AND REGULATION OF FOR-HIRE TRANSPORTATION SERVICES AND PASSENGER SERVICE COMPANIES IN MIAMI-DADE COUNTY.**

19. Originally subject to inconsistent oversight from cities and localities in South Florida, the for-hire transportation industry became uniformly regulated by the County in 1981.

20. Today, all regulations relevant to for-hire transportation in Miami-Dade County are contained in Chapter 31 of the MDCCO and for-hire industry oversight is conducted by the Department of Regulatory and Economic Resources ("DRER"), a County agency which was formerly known as the CSD. Chapter 31 is enforced by DRER personnel, police forces of various municipalities in Miami-Dade County, and by the Miami-Dade Police Department.

21. The for-hire transportation industry in Miami-Dade County operates under the "medallion" system. The County explicitly created intangible property in the holder of a for-hire license, as the MDCCO states that the "[m]edallion [s]ystem . . . deems a taxicab for-hire license to be **intangible property**." *See id. at* § 31-81(aa) (emphasis added).

22. The MDCCO defines "for-hire" as "driving, operating, or managing a for-hire passenger motor vehicle" in Miami-Dade County. *See id. at* § 31-81(q).

5

23. According to the MDCCO, the terms "medallion" and "for-hire license" are interchangeable.

24. The MDCCO defines a "for-hire license" as "an annual, renewable license . . . which authorizes the provision of for-hire transportation services and which may expire, be suspended or revoked." *See id.* at § 31-81(r).

25. A regular for-hire license entitles its owner to provide for-hire transportation services anywhere within Miami-Dade County, save Miami International Airport and the Port of Miami, which require additional fees and regulatory compliance for the provision of for-hire transportation services.

26. Plaintiffs and members of the putative class are authorized and regulated regular for-hire license holders in Miami-Dade County.

27. The total number of for-hire licenses in Miami-Dade County are limited, and a few new for-hire licenses are occasionally auctioned off in a lottery.

28. In Miami-Dade County, prior to enactment of the Ordinance, for-hire transportation services could lawfully be performed:

    a. By a for-hire license holder him/herself as a chauffeur; or

    b. Through a passenger service company.

29. For-hire license holders in Miami-Dade County, whether an individual or an entity, must comply with regulations including, but not limited to:

    a. A for-hire license/medallion for each vehicle;

    b. Submission to regular background checks;

    c. Possession of approved automobile insurance secured from a member of the Florida Insurance Guarantee Association ("FIGA");

    d.   Passing regular vehicle inspections;

    e.   Adherence to established fare payment schedules;

    f.   If the for-hire vehicle is wheelchair accessible, proper training and certification in the safe and proper methods of securing, transporting, and dealing with the passengers utilizing a wheelchair;

30.   Miami-Dade County explicitly forbids the operation of for-hire vehicles without for-hire licenses, stating that:

> **It shall be unlawful** for any person to use, drive or operate, or to advertise in any newspaper, airwave transmission, telephone directory or other medium accessible to the public that it offers for-hire services, or to cause or permit any other person to use, drive or operate any for-hire motor vehicle upon the streets of Miami-Dade County **without first obtaining a Miami-Dade County for-hire license** . . .

   *Id.* at § 31-82(a) (emphasis added).

31.   The MDCCO defines "passenger service company" as a "Florida corporation or partnership created for the purpose of providing passenger services for for-hire taxi operations and providing various services to for-hire license holder(s) and chauffeurs." *See id.* at § 31-81(s).

32.   The MDCCO also strictly and explicitly forbids the operation of a passenger service company without authorization from a for-hire license holder, stating that "No person or entity shall provide taxicab passenger services on behalf of a for-hire license holder without such person or entity first obtaining a Miami-Dade County Passenger Service Company registration." *Id.* at § 31-100(a).

33.   A passenger service company's functions are defined in Chapter 31 of the MDCCO, and consist of:

[P]roviding for-hire vehicle color schemes and markings; providing dispatch services, maintenance and advertising of a telephone number for receiving all calls related to for-hire taxi services; handling passenger complaints and passenger lost and found; [and maintaining] a properly listed telephone for receiving all calls relating to for-hire vehicle service.

*See id.* at § 31-100(b).

34. To legally operate in Miami-Dade County as a passenger service company, an entity must comply with MDCCO requirements including, but not limited to:

   a. Payment of a registration fee;

   b. Ensuring that each vehicle it operates, or allows to be operated, is insured by a member of FIGA;

   c. Maintaining a quality assurance program including regular training for all affiliated chauffeurs;

   d. Providing a two-way dispatch system.

35. Chapter 31 of the MDCCO was/is implemented to protect the health, safety, and welfare of the public. With respect to the taxicab industry:

   a. Issuance of for-hire licenses requires all applicants to submit their personal information for a criminal background check conducted by Miami-Dade County and to a medical examination, all in the interest of ensuring the public of consistent standards of professional service. *See id.* at § 31-82(d). As an additional safety measure, chauffeur's licenses are required to be prominently displayed on the dashboard of all for-hire vehicles thereby providing the public with easy access to the name and all other pertinent information of the driver. *See id.* at § 31-303(i)(1).

b. Licensing of passenger service companies and for-hire license holders assures the public of minimum responsible corporate and individual standards, including appropriate complaint systems and lost-and-found procedures such that an individual can have immediate redress in the event of loss or injury.

c. All for-hire vehicles are required to be inspected regularly by the DRER to assure that the vehicles meet minimum safety standards, including, but not limited to, working windshield wipers, functional safety belts, functioning air conditioning, functioning windows and door locks, properly inflated tires, etc. *See id.* at § 31-89(d); *see also id.* at § 31-82(f); *see also id.* at § 31-89(a)(1)-(25).

d. All for-hire vehicles are required to carry insurance coverage through an insurance company that is a member of FIGA to guarantee that all individuals who are injured as a result of the for-hire operations will be properly compensated even if the insurer becomes insolvent. FIGA will pay the injured party in such an event. Further, Miami-Dade County requires the named insureds to be the passenger service company, the for-hire license holder, the vehicle owner, and the chauffeur, for all activities, thereby eliminating coverage loopholes for the benefit of the public. *See id.* At § 31-88(a).

e. An established fare schedule including meter rates and/or flat rates provides the riding public with full disclosure and knowledge of the

approximate cost of each ride. *Id.* at § 31-86(a). These measures protect the public from unanticipated surge pricing and price-gouging.

36.   Since Plaintiffs and members of the putative class are authorized for-hire license holders in Miami-Dade County, members of the riding public can hail one of the Plaintiffs' or putative class members' authorized for-hire vehicles on the street, use a cell-phone to summon a ride either telephonically or through an internet-based smartphone application such as Way2Ride, or go online to arrange travel via a website.

37.   Although the members of the riding public never exchange formal written contracts with authorized for-hire license holders, members of the riding public do enter into de-facto contracts and business relationships, whereby the customer is transported to a desired location and, in exchange, agrees to pay the published rate for the trip.

## C. MIAMI-DADE COUNTY'S ENDORSEMENT OF PLAINTIFFS' PROPERTY RIGHTS

38.   In addition to deeming the Plaintiffs' for-hire licenses to be intangible property, the County provided through the MDCCO that the provision of for-hire transportation would be restricted specifically to for-hire license holders, and limited the issuance of new for-hire licenses.

39.   In so doing, the County allowed a secondary market to form wherein the for-hire licenses were traded for value. The County reaped the benefits of this secondary market in 2012, when it auctioned off several regular for-hire licenses and each of them were sold for amounts well in excess of $400,000.

40.  Moreover, upon information and belief, numerous members of the Miami-Dade County Board of County Commissioners have gone on record to assure Plaintiffs and members of the putative class of the protectable property rights that they possess.

41.  All for-hire licenses are eligible to be resold, or are capable of lapsing, and upon information and belief, the secondary fair market value of a for-hire license in January of 2014 was approximately $340,000.00.

## D. UBER AND LYFT BEGIN OPERATING IN MIAMI-DADE COUNTY.

42.  UBER and LYFT both have principal places of business and operate out of San Francisco, California. Both TNCs have histories of entering particular cities or counties and attempting to obtain special treatment so that they need not comply with local and/or state regulations with which its competitors must comply.

43.  The TNCs operate as passenger service companies within the meaning of the MDCCO by hiring drivers to provide for-hire transportation services to consumers through the use of a smartphone application, and by receiving a portion of all proceeds produced as the result of dispatch operations through communications routed through said smartphone applications.

44.  When using UBER or LYFT, members of the public enter into contracts and business relationships through smartphone apps whereby they locate, schedule and summon UBER or LYFT drivers, who then conduct for-hire transportation services for members of the public by transporting them to a desired location in exchange for credit card payments through the smartphone apps. On certain occasions, including times of high volume or inclement weather, these fares can be doubled, tripled or multiplied exponentially by what is known as surge pricing.  Once the payment is made,

depending which service used, UBER or LYFT then take a share of the fare, and remit the remaining percentage back to the driver.

45. Despite full knowledge that Miami-Dade County required individual for-hire licenses for each automobile that a passenger service company used to conduct for-hire transportation services, when the TNCs originally entered the market in approximately June of 2014, they intentionally failed to secure for-hire licenses and/or chauffeur's agreements and began operations in Miami-Dade County as a passenger service company.

46. The County responded to the TNCs arrival by ticketing TNC drivers, and by impounding vehicles used by same.

47. Numerous citations reflecting the fact that the TNCs were not in compliance with Chapter 31 of the MDCCO have been issued against the TNCs since they began operating in Miami-Dade County.

48. Upon information and belief, the TNCs have reimbursed their drivers for fines associated with violations of MDCCO, and have also agreed to provide drivers with legal representation for all potential violations in Miami-Dade County.[1]

49. The TNCs never made any attempts to comply with any applicable regulations regarding for-hire transportation and passenger service companies in Miami-Dade County.

50. Instead, upon information and belief, the unauthorized and illegal for-hire operations have always been a part of the business plans of both UBER and LYFT. In response to ticketing by the County, LYFT representatives have been quoted as saying:

---

[1] Camila Souza, Fines Won't Keep Uber and Lyft Down in Miami, TECH COCKTAIL MIAMI (June 6, 2014) http://tech.co/uber-lyft-miami-fines-2014-06.

We have received reports that local Lyft drivers have recently received citations in Miami. In all cases, we have responded immediately to provide support and we are also covering the cost of the citations and any necessary legal assistance. Throughout this process, we commit to standing strong with drivers and passengers every step of the way, fighting any citations, covering relevant costs, and making **policy progress**.[2]

51.    The unauthorized and illegal for-hire transportation service operations by the TNCs in

Miami-Dade County have diluted the for-hire transportation market in Miami-Dade

County and thereby significantly devalued the for-hire licenses held by the Plaintiffs

and putative class. As a direct result, the actions of the TNCs inflicted extensive

damages upon the Plaintiffs and putative class prior to the County's passage of the

Ordinance.

### E.   MIAMI-DADE COUNTY GIVES UBER AND LYFT CARTE BLANCHE TO OPERATE AS PASSENGER SERVICE COMPANIES WITHOUT THE ATTENDANT REGULATIONS IMPOSED UPON PLAINTIFFS AND THE PUTATIVE CLASS

52.    Upon information and belief, for a period beginning prior to the official operational

entrance of the TNCs into the Miami-Dade County for-hire transportation market and

continuing to date, the TNCs have lobbied the Miami-Dade County Board of County

Commissioners and Mayor Carlos Giminez aggressively for special treatment so that

they need not be forced to comply with applicable local and state regulations with

which their direct competitors, the taxi industry, must comply with.

53.    On May 3, 2016, the Miami-Dade County Board of County Commissioners passed the

Ordinance, which allows the TNCs to operate within their own legal classification,

despite the fact that the TNCs are already operating as passenger service companies,

dispatching drivers who provide for-hire transportation without for-hire licenses, the

---

[2] *Id.* (emphasis added).

effect of which has been and will continue to be the flooding of the Miami-Dade County for-hire market and devaluation of the for-hire licenses owned by the Plaintiffs and the putative class.

54. Even though the TNCs and the putative class operate identical businesses, i.e., providing transportation services for the public in exchange for payment, upon the passage of the Ordinance, the County elected to favor the TNCs, rendering unto them an unwarranted competitive advantage, as follows:

    a. MDCCO § 31-100(e)(3) requires passenger service companies to secure chauffeur's agreements with each chauffeur who operates or drives a for-hire vehicle for the passenger service company; conversely, TNCs are granted a much wider berth and simply must not "authorize any individual [to drive for the TNC] that has been denied a chauffeur's registration in Miami-Dade County. MDCCO § 31-702(q)(6).

    b. MDCCO § 31-88(a)-(b), as well as § 31-100(e)(2), requires that each for-hire vehicle operated by a passenger service company, or which it allows to be operated, is insured by a member of FIGA, and additionally requires that insurance certificates for each for-hire vehicle regulated pursuant to a for-hire license must be filed with the DRER, and that each such vehicle must have insurance that complies with the requirements promulgated by the state of Florida, are at least $50,000.00 per person, $150,000.00 per occurrence of bodily injury, and $250,000.00 for each occurrence of property damage. *See* Fla. Stat. 324.032. Conversely, pursuant to the new regulations and specifically MDCCO § 31-707, TNCs face no such

requirement to procure insurance guaranteed by FIGA, TNCs can file a blanket statement certifying compliance with all applicable insurance laws for all of vehicles that the TNC operates, and there are no explicit minimum limits of liability, except that TNCs are required to file a certificate "demonstrating compliance with Florida insurance laws." *Id.* at MDCCO § 31-707.

c. Pursuant to MDCCO § 31-82(d), the DRER itself investigates each application for a for-hire license, ensuring that the user has not misrepresented or concealed facts, that the applicant has not pled *nolo contendre* or guilty to any crimes in the last five years, and that the applicant is authorized to work in the United States; conversely, the new regulations as they apply to TNCs impose no such hurdles, as TNCs are allowed to independently conduct their own background checks. MDCCO § 31-702(q).

d. Pursuant to MDCCO § 31-89, vehicles operating pursuant to for-hire licenses must be inspected by the DRER. The MDCCO expressly requires that vehicles operating pursuant to a for-hire license are inspected regularly and for a fee that is paid to the DRER. Conversely, pursuant to MDCCO § 31-708, TNCs are allowed to take their vehicles to independent places of inspection, where the TNC provider can allow a "mechanic or automobile technician" to fill out a pre-provided inspection form, and upon information and belief, the TNC provider need not file the form with the DRER.

15

e.  Pursuant to MDCCO § 31-89, vehicles operating pursuant to a for-hire license are required to: (1) be free from "grime, oil, or other substances and free from cracks, breaks, dents and damaged paint that detracts from the overall appearance of the vehicle"; (2) have hubcaps or wheelcovers on all four (4) wheels; have interior trunk space that is free from dirt, grime, oil trash or other material which could soil items placed therein . . . " ; and (3) ensure that the passenger compartment is "clean, free from torn upholstery or floor coverings, damaged or broken seats and protruding sharp edges." Conversely, under the Ordinance, the TNCs are subject to none of the above mentioned requirements.

f.  Pursuant to MDCCO § 31-87, the maximum rates for for-hire transportation provided pursuant to a for-hire license are set by the Board of County Commissioners of Miami-Dade County, and the Ordinance does not allow for the ability to surcharge during periods of economic necessity. Conversely, MDCCO 31-706 states that TNCs "may establish and charge fares for transportation services based on distance traveled and/or time elapsed during service, a flat prearranged rate or a suggested donation . . ."

55.  The effect of "regulating" the TNCs is to legalize, upon information and belief, upwards of ten thousand for-hire transportation providers in Miami-Dade County, and to thereby remove any and all disincentives or barriers to the increasing dilution of the for-hire transportation market in same. This has significantly impaired the value of the

intangible property held by the Plaintiffs and the putative class and will continue to do so for the foreseeable future.

56.   In essence, the County has given the TNCs carte blanche to operate in whatever fashion they deem fit, with negligible accountability or oversight, whereas the putative class remains subject to arbitrary, onerous, and time and energy consuming regulations.

## CLASS ALLEGATIONS

### A.   CLASS DEFINITIONS

57.   Pursuant to Fla. Stat. § 1.220(b)(1)(B) and 1.220(b)(3), Plaintiffs  bring this claim on behalf of all persons or entities holding regular for-hire licenses in Miami-Dade County pursuant to Chapter 31 of the MDCCO.

58.   Excluded from the putative class are the Defendant County, its employees, agents, contractors, co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and judicial officers and their immediate family members and associated court staff assigned to this case.

59.   Plaintiffs and the putative class reserve the right to modify or amend the definition of the proposed putative class before the Court determines whether certification is appropriate.

60.   Plaintiffs' and the putative class's claims are appropriate for class-wide treatment because Plaintiffs' and the putative class can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

## B.    NUMEROSITY

61.    Members of the putative class are so numerous that joinder of all members would be impracticable. On information and belief, there are more than 500 for-hire license holders in Miami-Dade County, Florida. The individual class members are also ascertainable, as the names and addresses of all class members can be identified in public records. Plaintiffs and the putative class do not anticipate any difficulties in the management of the action as a class action.

## C.    COMMONALITY

62.    There are questions of law and fact that are common to all claims of the Plaintiffs and the putative class. Among such questions of law and fact are the following:

    a.  Does passage of the Ordinance devalue the for-hire licenses, deemed to be intangible property by the MDCCO, owned by Plaintiffs and members of the putative class?;

    b.  By how much does the County's passage of the Ordinance devalue the for-hire licenses, deemed to be intangible property by the MDCCO, which are held by the Plaintiffs and the putative class?;

    c.  Whether the TNC's and Plaintiffs and members of the putative class are substantially similar entities in their form and function?;

    d.  Whether the County's passage of the Ordinance discriminates against the Plaintiffs in favor of the TNCs?;

    e.  What was the fair market value of a for-hire license when UBER began operating in Miami-Dade County?;

f.   What was the fair market value of a for-hire license when LYFT began operating in Miami-Dade County?;

g.   What is the affect of the passage of the Ordinance on the value of the for-hire licenses, deemed to be intangible property by Chapter 31 of the MDCCO, that are owned by Plaintiffs and members of the putative class?'

h.   When did UBER begin operating in Miami-Dade County?;

i.   When did LYFT begin operating in Miami-Dade County?

## D.   TYPICALITY

63.   Plaintiffs' claims are typical of the claims of the putative class members because proving the claims of one for-hire license holder will prove the claims of the entire putative class. The same evidence and legal rulings necessary to support the Plaintiffs' claims will necessarily establish the claims of the entire putative class.

64.   Plaintiffs are members of the class they seek to represent, and their claims are typical of the respective putative class's claims because of the similarity, uniformity, and common purpose of Defendant's unlawful conduct. Each member of the putative class has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of the Defendants' wrongful conduct.

## E.   ADEQUACY OF REPRESENTATION

65.   The Plaintiffs are adequate representatives of the class they seek to represent and will fairly and adequately protect the interests of such class. The Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them. There is no divergence of

interest between Plaintiffs and the putative class members. Plaintiffs and their counsel anticipate no difficulty in the management of this litigation as a class action.

66. To prosecute this case, the Plaintiffs have chosen the undersigned law firm, which is experienced in this type of litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

## F.  PREDOMINANCE

67. The County has acted and/or refused to act on grounds that are generally applicable all members of the putative class, and final declaratory relief concerning the class as a whole is therefore appropriate.

68. The questions of law or fact common to the Plaintiffs' and the putative class's claims predominate over any individual questions of law or fact.

69. Because this lawsuit is grounded on the County's passage of the Ordinance will affect the Plaintiffs and members of the putative class equally, the only conceivable individual issues pertain to damages. It is well established that individual damages questions are not relevant to a predominance analysis.

## G.  SUPERIORITY

70. A class action on behalf of the Plaintiffs and the putative class is superior to individual actions in part because of the non-exhaustive factors listed below:

    a.  Joinder of all putative class members would create extreme hardship and inconvenience for the affected for-hire license holders as they are extremely numerous and reside in different areas of Miami-Dade County;

    b.  There are no known individual members of the putative class who are interested in individually controlling the prosecution of separate actions;

   c.  The interests of justice will be well served by resolving the common disputes of potential members of the putative class in one forum;

   d.  Individual suits would not be cost effective or economically maintainable as individual actions;

   e.  Individual suits would be difficult to manage because common legal rulings could not be applied to each individual suit; and

   f.  The action is manageable as a class action.

### COUNT I – VIOLATION OF RIGHT TO EQUAL PROTECTION

71.  Plaintiffs re-allege and incorporate herein all of the allegations contained in paragraphs one (1) through seventy (70).

72.  Plaintiffs have a right to equal protection under the law pursuant to the Fourteenth Amendment to the United States Constitution (through 42 U.S.C. § 1983) and Article I, Section 2 of the Florida Constitution.

73.  The County's enactment of the Ordinance is an abridgment of the Plaintiffs' right to equal protection of the laws.

74.  TNCs and Plaintiffs are similarly situated entities that provide for-hire services to consumers in Miami-Dade County. As such, on its face and as applied, the Ordinance is unconstitutional because it arbitrarily treats Plaintiffs on less than equal terms than it treats the TNCs.

75.  Notably, in that both the Plaintiffs and putative class and TNCs provide transportation in exchange for compensation, the County itself acknowledges that the putative class is similarly situated to the TNCs, as MDCCO § 31-77 states that "for-hire means any

vehicle driven by a person which engages in the transportation of persons and their accompanying property for compensation over the public streets."

76. Despite this fact, through passage of the Ordinance, the County has arbitrarily agreed to waive rules, laws, and codes for the TNCs that will remain in full force and effect for the Plaintiffs and putative class.

77. In so doing, the County has intentionally chosen to arbitrarily carve out an exception to laws that would otherwise apply to the TNCs in favor of creating new, special and less onerous laws, the effect of which is to discriminate against Plaintiffs in favor of the TNCs.

78. The County's decision to do so is not rationally related to legitimate governmental interests. Instead, the decision to enact the Ordinance is irrational and wholly arbitrary, and made in order to avoid a legal and public relations battle with the TNCs, which may erupt if the County attempts to enforce the rules, laws and codes applicable to both Plaintiffs and the TNCs.

79. As a direct and proximate result of the County's violation of a right guaranteed by both the United States Constitution and Florida Constitution, Plaintiffs have in the past and will continue to suffer in the future direct and consequential damages.

WHEREFORE, Plaintiffs seek a judgment against the County for direct damages, consequential damages, attorney's fees under 42 U.S.C. § 1988, interest, costs and for such other and further relief as this Court deems appropriate.

## COUNT II – DECLARATORY JUDGMENT

80.   Plaintiffs re-allege and incorporate herein all of the allegations contained in paragraphs one (1) through seventy (70).

81.   Given the aforementioned conduct and allegations, Plaintiffs seek a declaration that the Ordinance will violate their right to equal protection of the laws, and therefore that the Ordinance is unconstitutional and unenforceable.

82.   Additionally, Plaintiffs also seek a declaration that the TNCs are operating as passenger service companies within the meaning of the regulations of Chapter 31 of the MDCCO.

83.   Defendant's actions are ongoing, and there is a bona fide, actual and present need for such a declaration.

WHEREFORE, Plaintiffs seek a declaration that the Ordinance violates their right to equal protection of the laws, and therefore that it is unconstitutional and unenforceable, and a declaration that the TNCs are operating as if they are passenger service companies within the meaning of Chapter 31 of the MDCCO, and that they are therefore required to comply with all laws, codes and rules applicable to Plaintiffs.

## COUNT III – INJUNCTIVE RELIEF

84.   Plaintiffs re-allege and incorporate herein all of the allegations contained in paragraphs one (1) through seventy (70).

85.   As stated above, the Ordinance violates the Plaintiffs' right to equal protection of the laws, and therefore that it is unconstitutional and unenforceable.

86. Absent injunctive relief from this Court, Plaintiffs will suffer irreparable harm, as a result of the significant devaluation of their for-hire licenses, which have been deemed to be intangible property.

87. There is no adequate remedy at law that may serve to prohibit the County from carving out exceptions to all the laws, codes and rules applicable to the Plaintiffs in favor of the TNCs.

88. The threatened injury to the Class outweighs any injury to the County, and the granting of this injunction will serve the public interest.

WHEREFORE, the Plaintiffs seek entry of the following Orders:

    a. That the Court, after notice of hearing, issue a temporary injunction against the Defendant County, enjoining it from enforcing the Ordinance.

    b. That the Court, after a trial on the merits, issue a permanent injunction against the Defendant County, enjoining it from enforcing the Ordinance.

    **c.** All other relief this court deems just and proper, including attorney's fees under 42 U.S.C. § 1988.

## COUNT IV – INVERSE CONDEMNATION

89. Plaintiffs re-allege and incorporate herein all of the allegations contained in paragraphs one (1) through seventy (70).

90. Plaintiffs and other members of the putative class own property in Miami-Dade County, Florida and are thereby entitled to the protection of the laws of the United States and the State of Florida, specifically including:

    a. Amendment V to the United States Constitution;

    b. Article X, Section 6(a) of the Constitution of the State of Florida; and

     c.   Section 120.68 of the Florida Statutes.

91.   The constitutional guarantees cited herein protect private property owners from suffering government to take their private property without payment of just or full compensation therefore.

92.   Through the Ordinance, the County has substantially interfered with the private property held by the Plaintiffs in that their for-hire licenses will be, and are, significantly devalued as a result of the legalization and/or regulation of the TNCs.

93.   The County's actions do not substantially advance a legitimate state interest.

94.   The County has never made any offer to Plaintiffs to purchase their property, or any part thereof or interest therein, or to pay damages for the taking that the County has effectuated, nor has the County instituted eminent domain proceedings to acquire it, or any part thereof or interest therein. Therefore, the County is in violation of:

     a.   Amendment V to the United States Constitution; and

     b.   Article X, Section 6(a) of the Constitution of the State of Florida.

95.   For as long as the TNCs continue to operate in Miami-Dade County, the damages and injuries herein complained of are present, permanent and continuing in their impact.

WHEREFORE, the Plaintiffs on behalf of themselves and all other similarly situated respectfully request that this Court determine the amount of damages, including the just and full compensation for the taking that Plaintiffs and other members of the putative class have suffered as a result of the Defendant's actions, and award same as well as such other and further relief as this Court deems appropriate, including attorney's fees under 42 U.S.C. § 1988.

## COUNT V - VIOLATION OF THE COMMERCE CLAUSE

96.   Plaintiffs re-allege and incorporate herein all of the allegations contained in paragraphs one (1) through seventy (70).

97.   Defendant Miami-Dade County has chosen to regulate the TNCs in a manner that is markedly different than the manner in which traditional for-hire medallion owners, such as Plaintiffs and the putative class are regulated.  As a result of the Ordinance, TNCs are not subject to onerous regulatory requirements that are imposed upon the Plaintiffs and the putative class, including: price controls, regulatory fees, the requirement of FIGA insurance, state verified background checks, and unlike the Plaintiffs and the putative class, TNCs have no maximum fare rate for the for-hire transportation services they perform.

98.   There is no rational basis to treat TNCs differently from the Plaintiffs and the putative class. All such entities provide for-hire transportation services in Miami-Dade County, only the manner in which a ride is hailed sometimes differs, and even then, it does not often differ in a meaningful way.

99.   By enacting the Ordinance, defendant Miami-Dade County has chosen favored businesses to provide such services in an anticompetitive manner, and unconstitutionally deprived Plaintiffs and the putative class the opportunity fairly to compete with the TNCs.

100.  This is hornbook monopolization strategy: TNCs are permitted to operate in any manner they see fit, charge any amount they see fit, and be excused from onerous regulatory mandates heaved upon Plaintiffs and the putative class. This scheme deprives Plaintiffs and the putative class from fairly competing in the Miami-Dade

County for-hire transportation market, and is designed eventually to run Plaintiffs and the putative class out of business, leaving the market alone for TNCs.

101. The economic effects of Miami-Dade County's conduct are interstate in reach. The majority of for-hire transportation services utilized in Miami-Dade County are by tourists who have travelled to Miami-Dade County from out-of-state. This is particularly true of pick-ups and drop-off's at Miami-Dade County's airport, seaport, and the tourist destination of Miami-Beach. By implementing a regulatory scheme that can have but one end, the monopolization of the market by TNCs, Miami-Dade County has insured that prices will be driven up in the for-hire transportation market when Plaintiffs and the putative class are forced to shut their doors for the favored TNCs.

102. At the same time, Miami-Dade County continues to require Plaintiffs and the putative class to charge mandated rates and pay mandated fees, all of which impermissibly burden and restrict the free flow of interstate commerce.

103. Defendant Miami-Dade County has acted under color of state law and has deprived Plaintiffs and the putative class of rights, privileges, and immunities secured to them by the United States Constitution.

WHEREFORE, Plaintiffs seek a judgment against the County for direct damages, consequential damages, attorney's fees under 42 US.C. § 1988, interest, costs and for such other and further relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs MIADECO CORP., B&S TAXI CORP. and CHECKER CAB OPERATORS, INC. demand a trial by jury on all issues so triable as of right.

**DATED:** May 4, 2016

Respectfully submitted,

**PATINO & ASSOCIATES, P.A.**
*Attorneys for the Plaintiffs*
550 Biltmore Way, Suite 740
Coral Gables, Florida 33134
T: (305) 443-6163
F: (305) 443-5635
service@patinolaw.com

By:     ___/s Ralph G. Patino_____.
       **RALPH G. PATINO, ESQ.**
       Florida Bar No. 768881