UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-21976-CIV-GAYLES/Turnoff

**MIADECO CORP.**, *et al.*,

    Plaintiffs,

vs.

**MIAMI-DADE COUNTY**,

    Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

**THIS CAUSE** came before the Court on the Motion to Dismiss Amended Class Action Complaint ("Motion") [ECF No. 12], filed by Defendant Miami-Dade County (the "County") on June 29, 2016. Plaintiffs Miadeco Corp., B&S Taxi Corp., and Checker Cab Operators, Inc. ("Plaintiffs"), filed their Response in Opposition . . . ("Response") [ECF No. 30] on September 15, 2016. The County filed its Reply in Support . . . ("Reply") [ECF No. 41] on November 16, 2016. The Court has carefully considered the parties' submissions, the record, and applicable law. For the reasons that follow, the Motion is granted.

### I. BACKGROUND[1]

Plaintiffs initially filed their Class Action Complaint in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida, on February 22, 2016. [ECF No. 1-2 at 5–30]. They then filed their Amended Class Action Complaint and Demand for Jury Trial ("Amended Complaint") [ECF No. 1-2 at 41–68] on May 4, 2016. The County timely removed

---

[1] The Court takes the allegations from the Amended Complaint, the operative complaint in this case, as true for purposes of a Motion to Dismiss. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

the action to this Court on June 1, 2016, pursuant to 28 U.S.C. §§ 1441(a) and (b) and 1446. [ECF No. 1]. The Amended Complaint advances claims pursuant to 42 U.S.C. § 1983 for alleged violations of equal protection (Count I) under the Fourteenth Amendment to the United States Constitution and Article I, Section 2, of the Florida Constitution; alleged violations of the Fifth Amendment to the United States Constitution and Article X, Section 6(a), of the Florida Constitution for inverse condemnation (Count IV); and alleged violations of the commerce clause (Count V) under Article I, Section 8, Clause 3, of the United States Constitution. In addition to damages and attorney's fees, the Amended Complaint seeks a declaratory judgment (Count II) and injunctive relief (Count III). This Court has original jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.

Plaintiffs are for-hire taxicab license holders in Miami-Dade County that are governed by the Miami-Dade County Code of Ordinances ("Code").[2] Section 1.01(A)(3) of the Miami-Dade County Home Rule Charter expressly grants the Board of County Commissioners the power to "[l]icense and regulate taxis, jitneys, limousines for hire, rental cars, and other passenger vehicles for hire operating in the county." Pursuant to this power, the County adopted Chapter 31

---

[2] The County requests that the Court take judicial notice of the County Ordinances and related documents that are undisputed public records or are referred to in the Amended Complaint and are central to Plaintiffs' claims. (*See* Mot. 3 n.1). The County has attached certified copies of various documents to its Motion. [ECF Nos. 12-1–12-20].

"In general, if it considers materials outside of the complaint, a district court must convert the motion to dismiss into a summary judgment motion." *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). "There is an exception, however, to this general rule. In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Id.* Federal Rule of Evidence 201(b) provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." "A district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment." *Universal Express, Inc. v. U.S. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006). "Public records are among the permissible facts that a district court may consider." *Id.*

Accordingly, the Court takes judicial notice of the Miami-Dade County Code of Ordinances for purposes of ruling on the County's Motion. *Also available at* https://www.municode.com/library/fl/miami_-_dade_county/codes/code_of_ordinances (updated Feb. 23, 2017).

of the Code. The County's regulations of for-hire taxicabs are contained in Article II of Chapter 31. Particularly, "[i]t shall be unlawful for any person to use, drive or operate . . . any for-hire motor vehicle upon the streets of Miami-Dade County without first obtaining a Miami-Dade County for-hire license and maintaining it current and valid pursuant to the provisions of this article." Code § 31-82(a). The license, or "medallion," is intangible property. *See* Code §§ 31-81(z), (aa). The County limits the total quantity of medallions but also occasionally auctions off new medallions. *See* Code § 31-82(o). The medallions are eligible to be resold, *see* Code § 31-82(r), with a secondary fair market value in January 2014 of approximately $340,000.00. (*See* Am. Compl. ¶ 41).

On May 3, 2016, the Miami-Dade County Board of County Commissioners passed an Ordinance regulating the operation of new transportation network entities ("TNEs") such as Uber and Lyft. The County's regulations of TNEs are contained in Article VII of Chapter 31. The County's provision regarding operations is as follows:

> It shall be unlawful for any transportation network entity to begin operations, or allow transportation network entity drivers to provide transportation network entity services . . . upon the streets of Miami-Dade County, Florida, without first obtaining a preliminary transportation network entity license or a transportation network entity for-hire license and maintaining its current and valid pursuant to the provisions of this article. There shall be no limitation on the number of preliminary licenses or transportation network entity licenses that may be issued.

Code § 31-702(a). Accordingly, the Code does not require TNE drivers to obtain medallions under § 31-82(a) to operate within the County. Instead, TNEs have a completely separate and distinct regulatory system, with varying requirements to operate within the County from those imposed on taxicabs.[3] As a result of the new Ordinance, over 10,000 TNE drivers now operate in

---

[3] For example, Plaintiffs allege that taxicabs within the County must submit to background checks, possess automobile insurance from a member of the Florida Insurance Guarantee Association, pass vehicle inspections, and adhere to established fare payment schedules. (*See* Am. Compl. ¶¶ 29, 35). In contrast, Plaintiffs allege that TNEs

3

the County. (*See* Am. Compl. ¶ 55). Plaintiffs allege that this increase in non-medallion holders has diluted the for-hire transportation market, impairing the value of Plaintiffs' intangible property. (*See id.*).

Accordingly, in Counts I, II, and III of the Amended Complaint, Plaintiffs allege that their equal protection rights have been violated by the County's arbitrary differentiation between the ordinance for taxicabs, which requires medallions and one set of regulations, and the ordinance for TNEs, which does not require medallions and has a completely different set of regulations. Plaintiffs allege that the TNE "Ordinance is unconstitutional because it arbitrarily treats Plaintiffs on less than equal terms than it treats the TN[E]s." (*See id.* ¶ 74). Even though the taxicab Plaintiffs and the TNEs are similarly situated, Plaintiffs contend that "the County has intentionally chosen to arbitrarily carve out an exception to laws that would otherwise apply to the TN[E]s in favor of creating new, special and less onerous laws, the effect of which is to discriminate against Plaintiffs in favor of the TN[E]s," a decision "not rationally related to legitimate governmental interest" but rather "irrational and wholly arbitrary." (*See id.* ¶¶ 77–78).

In Count IV of the Amended Complaint, Plaintiffs allege an unlawful taking of their property without just compensation in violation of the 5th Amendment of the United States Constitution and Article X, Section 6(a), of the Florida Constitution. Specifically, Plaintiffs contend that "[t]hrough the Ordinance, the County has substantially interfered with the private property held by the Plaintiffs in that their for-hire licenses will be, and are, significantly devalued as a result of the legalization and/or regulation of the [TNEs]" and that "[t]he County's actions do not substantially advance a legitimate state interest." (*See id.* ¶¶ 92–93). Because the County has never offered to purchase Plaintiffs' medallions, nor paid for damages for their

---

are permitted to operate "within their own legal classification," with looser requirements regarding insurance, vehicle inspections, and fare charges. (*See id.* ¶¶ 53–54).

devaluation, Plaintiffs contend that the County is in violation of the state and federal constitutions.

In Count V of the Amended Complaint, Plaintiffs allege a violation of the commerce clause because "[a]s a result of the Ordinance, TN[E]s are not subject to onerous regulatory requirements that are imposed upon the Plaintiffs and the putative class," and because "[t]here is no rational basis to treat TN[E]s differently from the Plaintiffs and the putative class." (*See id.* ¶¶ 97–98). Plaintiffs argue that through the Ordinance, the County "has chosen favored businesses to provide such services in an anticompetitive manner, and unconstitutionally deprived Plaintiffs and the putative class the opportunity fairly to compete with the TN[E]s," something Plaintiffs describe as a "hornbook monopolization strategy." (*See id.* ¶¶ 99–100). Plaintiffs allege that the "economic effects" of the County's Ordinance "are interstate in reach" because the "majority" of those who use for-hire transportation services in the County are "tourists who have travelled to Miami-Dade County from out-of-state." (*See id.* ¶ 101). And Plaintiffs contend that the County's requirement that Plaintiffs "charge mandated rates and pay mandated fees . . . impermissibly burden[s] and restrict[s] the free flow of interstate commerce." (*See id.* ¶ 102).

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (alteration added) (quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). However, pleadings that "are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678.

## III. ANALYSIS

### A. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Accordingly, "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* at 440. This rational basis test is especially true with social or economic legislation, as "the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Id.* (citations omitted). The rational basis test gives way to heightened

forms of scrutiny for classifications based on race, alienage, national origin, or gender, or when personal rights are involved. *See id.* However, the Supreme Court has provided "that where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant . . . to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued. In such cases, the Equal Protection Clause requires only a rational means to serve a legitimate end." *Id.* at 441–42. The rational basis required to survive scrutiny under the Equal Protection Clause need not be the actual reason for implementing the law. "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is *any reasonably conceivable* state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (emphasis added). However, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 446.

The only issue, therefore, is whether the County's decision to create two separate classifications of for-hire transportation services in Chapter 31 of the Code is "arbitrary" or whether there is "any reasonably conceivable" reason that provides a rational basis for the County to distinguish between traditional taxicab providers and TNEs. The Seventh Circuit has squarely addressed this issue recently, as have numerous district courts around the country. Almost every court has concluded that such distinctions survive an equal protection challenge. *See, e.g.*, *Ill. Transp. Trade Ass'n v. City of Chicago*, 839 F.3d 594, 596 (7th Cir. 2016), *petition for cert. filed*, No. 16-1143 (U.S. Mar. 13, 2017); *Desoto CAB Co., Inc. v. Picker*, __ F. Supp. 3d __, 2017 WL 118810 (N.D. Cal. Jan. 12, 2017), *appeal docketed*, No. 11-123 (9th Cir. Feb.

7

14, 2017); *Newark Cab Ass'n v. City of Newark*, __ F. Supp. 3d __, 2017 WL 214075 (D.N.J. Jan. 18, 2017); *cf. S. Fla. Taxicab Ass'n v. Miami-Dade Cty.*, No. 00-1366-CIV-GOLD, 2004 WL 958073, at *12–13 (S.D. Fla. Mar. 18, 2004) (finding that the "County could have plausibly concluded that there was a rational basis to distinguish between taxis and limousines" and, accordingly, finding no violation of equal protection where the County treated taxicab and limousine license holders differently).

In *Illinois Transportation Trade Association v. City of Chicago*, the Seventh Circuit addressed a nearly identical equal protection challenge. The court noted that while "[t]axi companies are tightly regulated by the City regarding driver and vehicle qualifications, licensing, fares, and insurance," the TNE ordinance "is different from the ordinances governing taxi and livery services and more permissive." *See Ill. Transp.*, 839 F.3d at 596. The court noted that the regulations at issue were not arbitrary given the difference between Chicago's taxicabs and TNEs:

> Taxis but not TN[E]s are permitted to take on as passengers persons who hail them on the street. Rarely will the passenger have a prior relationship with the driver, and often not with the taxicab company either; and it makes sense therefore for the City to try to protect passengers by screening the taxi drivers to assure that they're competent and by imposing a uniform system of rates based on time or distance or both. So taxi service is regulated by the City of Chicago, but so is TN[E] service, though differently because the service is different from taxi service. A major difference is that customers, rather than being able to hail an Uber car, must sign up with Uber before being able to summon it, and the sign up creates a contractual relationship specifying such terms as fares, driver qualifications, insurance, and any special need of the potential customer owing to his or her having a disability. Unlike taxicab service[,] Uber assumes primary responsibility for screening potential drivers and hiring only those found to be qualified, and the passengers receive more information in advance about their prospective rides—information that includes not only the driver's name but also pictures of him (or her) and of the car. Furthermore, the TN[E]s use part-time drivers extensively, and it is believed that these part-timers drive their cars fewer miles on average than taxicab drivers, who are constantly patrolling the streets in hope of

> being hailed; and the fewer miles driven the less likely a vehicle is to
> experience wear and tear that may impair the comfort of a ride in it and
> even increase the risk of an accident or a breakdown.

*Id.* at 598. The court there concluded that "[t]here are enough differences between taxi service and TN[E] service to justify different regulatory schemes, and the existence of such justification dissolves the plaintiffs' equal protection claim. Different products or services do not as a matter of constitutional law, and indeed of common sense, always require identical regulatory rules." *Id.*

It is clear from Plaintiffs' Amended Complaint that the County has not acted arbitrarily in its treatment of TNEs and taxicabs. Prior to the enactment of the Ordinance, the County enforced its for-hire regulations against illegally-operating TNEs by issuing tickets and impounding vehicles. (*See* Am. Compl. ¶ 47). In response to lobbying and changes in the for-hire transportation market, the County exercised its legislative prerogative to create a separate system of regulations for TNEs. Plaintiffs maintain that TNEs "operate identical businesses" to taxicabs. (*See id.* ¶ 54). However, Plaintiffs themselves identify some important differences between the two transportation systems: only taxicabs are hailed from the street, the riders have no formal contracts, and the set fare rate is published for the trip; meanwhile, TNEs are summoned through contracts made via smartphone applications and operate with varying prices depending on surge pricing and high rider volume. (*See id.* ¶¶ 36–37, 44). As the Seventh Circuit relied on these types of differences in its conclusion that there was a rational reason for distinct regulatory frameworks in Chicago, this Court also concludes that there exists at least "a rational means to serve a legitimate end," *see Cleburne*, 473 U.S. at 441–42, for the different regulatory schemes. Therefore, Plaintiffs have failed to state a cognizable claim under the Equal Protection Clause.

### B. Inverse Condemnation

The U.S. Constitution prohibits "private property" from being "taken" for public use

without just compensation. U.S. Const. amend. V. Just compensation is required not only for "physical" takings, but also for "regulatory" takings, in which government regulation of private property is "so onerous that its effect is tantamount to a direct appropriation." *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).

As a preliminary matter, it is important to clarify that Plaintiffs' property rights are in the intangible property of their medallions, not in the overall market system of for-hire transportation. "The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). However, Plaintiffs have not argued—nor could they—that the County has actually confiscated their licenses. And Plaintiffs' property rights derived from their medallions do not confer on them a fully restricted market or a monopoly on all for-hire transportation.

In *Minneapolis Taxi Owners Coalition, Inc. v. City of Minneapolis*, the Eighth Circuit addressed a similar marketplace takings issue. In 2006, the City of Minneapolis uncapped the number of taxicab licenses it issues "thereby opening a previously restricted market." *Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis*, 572 F.3d 502, 504 (8th Cir. 2009). At the time of the ordinance changes, the Minneapolis licenses had a secondary market resale value of approximately $19,000 to $25,000. *See id.* A taxi coalition sued the city, "arguing that the new ordinance reduced the value of the existing licenses to zero." *See id.* at 506. The court held "that any property interest that the taxicab-license holders[] may possess does not extend to the market value of the taxicab licenses derived through the closed nature of the City's taxicab market. *Id.* at 509.

The same reasoning applies to the Plaintiffs' argument here regarding the increased

market participation and decreased market value of their medallions. As the Seventh Circuit recently concluded with respect to a similar challenge in Milwaukee, "a taxi permit confers only a right to operate a taxicab (a right which, in Milwaukee, may be sold). It does not create a right to be an oligopolist, and thus confers no right to exclude others from operating taxis." *See Joe Sanfelippo Cabs, Inc. v. City of Milwaukee*, 839 F.3d 613, 615 (7th Cir. 2016). "The taxi permits issued by the Milwaukee city government are property, but have not been 'taken,' as they do not confer on the holders a property right in, amounting to control over, *all transportation* by taxis and taxi substitutes (such as Uber) in Milwaukee." *Id.* at 616 (emphasis added). The same reasoning applies to Plaintiffs' allegations about the 10,000 plus new TNE operators in Miami-Dade County.

"Property interests, of course, are . . . created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). The Code indeed provides for property interests in medallions, as well for the resale of medallions, which occurs through an existing secondary market. However, "a taking claim . . . cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control" because "when a citizen voluntarily enters such an area, the citizen cannot be said to possess the right to exclude." *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 216 (Fed. Cir. 1993) (citation, internal quotation marks, and emphasis omitted).

The Seventh Circuit also recently addressed the takings question in *Illinois Transportation Trade Association v. City of Chicago*. The court dismissed the plaintiffs' arguments that the TNE ordinance had somehow amounted to a taking of their taxi medallions: "the City is not confiscating any taxi medallions; it is merely exposing the taxicab companies to

new competition—competition from Uber and the other TN[E]s." *See Ill. Transp.*, 839 F.3d at 596. This Court fully adopts the reasoning set out in that case in dismissing the Plaintiffs' claims that a taking has occurred here:

> "Property" does not include a right to be free from competition. . . . When property consists of a license to operate in a market in a particular way, it does not carry with it a right to be free from competition in that market. . . . Taxi medallions authorize the owners to own and operate taxis, not to exclude competing transportation services. The plaintiffs in this case . . . cannot exclude competition from taxicab newcomers, for the City has reserved the right (which the plaintiffs don't challenge) to issue additional tax medallions. . . . The City has created a property right in taxi medallions; it has not created a property right in all commercial transportation of persons by automobile in Chicago. The plaintiffs continue to receive some insulation from competition, because they alone are permitted to operate taxicabs in Chicago. Taxicabs are preferred to Uber and other TN[E]s by many riders, because you don't have to use an app to summon them—you just wave at one that drives toward you on the street—and also because the fares are fixed by the City.

*Id.* at 596–97. Accordingly, the court found that "there is no merit to the plaintiffs' claim that the City has taken property from them without compensation." *Id.* at 598.

Here, Plaintiffs' bundle of rights in the intangible property of their taxi medallions provides for their exclusive use of their for-hire licenses. The County has not confiscated or otherwise negated their licenses. Plaintiffs are still free to lawfully conduct their taxicab businesses within the County, and there still exists a market for taxis. The medallions retain value, even accepting as true that the secondary market value of the medallions has decreased with the entrance of TNEs into the County's regulatory framework. Taxicabs have not, for now, become obsolete. As the Seventh Circuit noted, taxis cater to a traditional for-hire transportation market that still exists, as their riders are able to hail transportation curbside without the use of a smartphone application, and their fares are set by the County and not subject to TNEs' surge pricing formulas. As with all services and industries, markets ebb and flow, and change requires

adaptation and innovation. The County has reacted to market demand and the changes in technology and transportation that have spread across the country. As a result, the County's medallion holders are now subject to increased competition from TNEs. However, increased competition is not a taking under the law or the facts of this case.

*C. Commerce Clause*

Plaintiffs have procedurally abandoned their claims in Count IV under the commerce clause by failing to respond to the County's arguments for dismissal of those claims. (*See* Resp. 18 n.7) ("Plaintiffs do not offer argument in response to the County's arguments for dismissal of the other counts in their Complaint."). The rules of this Court provide that "each party opposing a motion shall serve an opposing memorandum of law" and that "[f]ailure to do so may be deemed sufficient cause for granting the motion by default." *See* Local R. 7.1(c). "Failure to respond to arguments in a motion to dismiss is a sufficient basis to dismiss such claims by default under this Local Rule." *A1 Procurement, LLC v. Hendry Corp.*, No. 11-23582-CIV, 2012 WL 6214546, at *3 (S.D. Fla. Dec. 13, 2012); *see also Bute v. Schuller Int'l Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned."). Other federal courts apply this notion of issue abandonment as well. *See, e.g.*, *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (noting that where the plaintiff "failed to defend" her claim in her responses to the motion to dismiss, "[h]er failure to pursue this claim beyond her complaint constituted abandonment"); *Hooper v. City of Montgomery*, 482 F. Supp. 2d 1330, 1334 (M.D. Ala. 2007) (finding that the plaintiff's failure to respond to the defendants' arguments concerning dismissal of certain claims resulted in abandonment of those claims). Accordingly, Plaintiffs' failure to respond to the attack on their commerce clause claim is sufficient for this Court to dispose of that

claim on a procedural basis. "It is not for the court to manufacture arguments on Plaintiff's behalf." *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp. 2d 1228, 1236 (M.D. Ala. 2000); *cf. Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."). However, it is equally clear on the merits that Plaintiffs have failed to state a valid claim under the commerce clause or the dormant commerce clause.

The threshold question for the court in analyzing a claim under the commerce clause is whether the plaintiff "is a part of interstate commerce." *See Exec. Town & Country Servs., Inc. v. City of Atlanta*, 789 F.2d 1523, 1525 (11th Cir. 1986). The commerce clause provides that "[t]he Congress shall have power . . . to regulate Commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. The commerce clause "restricts states and municipalities from imposing unreasonable burdens on interstate commerce." *Exec. Town*, 789 F.2d at 1525. If Plaintiffs' "business does not constitute a part of interstate commerce, the court will not interfere with the [government's] legitimate exercise of its police powers." *See id.*

Plaintiffs here are not engaged in interstate commerce. Plaintiffs are Florida corporations that own for-hire taxicab licenses and maintain principal places of business in Miami-Dade County, Florida. (*See* Am. Compl. ¶¶ 1–4). The fact that Plaintiffs' taxis operate wholly within Florida "does not, in and of itself, take [Plaintiffs] out of the stream of interstate commerce." *See Exec. Town*, 789 F.2d at 1525. However, "[g]enerally, taxicab service between airports and businesses and homes is not within the stream of interstate commerce." *Id.* (citations omitted).

Plaintiffs allege that the "economic effects" of the County's TNE regulations "are interstate in reach" because "[t]he majority of for-hire transportation services utilized in Miami-

Dade County are by tourists who have travelled to Miami-Dade County from out-of-state." (*See* Am. Compl. ¶ 101). Plaintiffs contend that "[t]his is particularly true of pick-ups and drop-offs at Miami-Dade County's airport, seaport, and the tourist destination of Miami-Beach." (*See id.*). And Plaintiffs maintain that the County's requirement that Plaintiffs charge mandated rates and mandated fees "impermissibly burden[s] and restrict[s] the free flow of interstate commerce." (*See id.* ¶ 102). Nevertheless, the Eleventh Circuit has noted that "[a] taxicab does not transform into an integral part of interstate commerce if, within the scope of its normal course of independent local service, the passenger happens to be beginning or completing an interstate trip." *See Exec. Town*, 789 F.2d at 1526. While there may be instances in which for-hire transportation services form part of interstate commerce, such as a limousine service with an established "nexus between its business and interstate commerce," Plaintiffs have not made a *prima facie* showing that such a nexus exists in this case beyond its conclusory speculative theory of "economic effects" of tourist activity in the County. *See id.*

Even if the Court were to find that Plaintiffs engage in interstate commerce, "it is important to note that the commerce clause 'protects the interstate market, not particular firms, from prohibitive or burdensome regulations.'" *See id.* (quoting *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127–28 (1978)). Accordingly, the Court's "inquiry is limited to whether interstate commerce in general, and not a particular entity, is burdened by the regulations." *See id.* at 1527. The Court "will uphold a state regulation if it regulates 'evenhandedly,' if it imposes only an 'incidental' burden on interstate commerce, and if the 'burden imposed on such commerce is [not] clearly excessive in relation to the putative local benefits.'" *See id.* at 1526–27 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). Plaintiffs allege negative effects on their particular businesses, and not the interstate market. (*See, e.g.*, Am. Compl ¶¶ 11, 55–56, 97–

15

101). Indeed, the increased market competition and choices available to consumers has a positive effect on the market as a whole, as there is a net increase in for-hire transportation services now available in the County. And even assuming *arguendo* that there is a burden on interstate commerce, the County has identified a "legitimate local public interest" in its regulations for TNEs, and those regulations will be upheld absent a "clearly excessive" burden "in relation to the putative local benefits." *See Pike*, 397 U.S. at 142.

## IV. CONCLUSION

The Court has considered the facts and history as outlined by the parties, the County's Code, and the arguments made by all the parties. Plaintiffs argue that amending their Amended Complaint would not be futile. (*See* Resp. 18). "Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant." *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007). The Court finds that any amendment to Plaintiffs' Amended Complaint would be futile, as dismissal would still be legally required for the reasons provided above. Judge Posner aptly observed:

> Indeed when new technologies, or new business methods, appear, a common result is the decline or even disappearance of the old. Were the old deemed to have a constitutional right to preclude the entry of the new into the markets of the old, economic progress might grind to a halt. Instead of taxis we might have horse and buggies; instead of the telephone, the telegraph; instead of computers, slide rules. Obsolescence would equal entitlement.

*Ill. Transp.*, 839 F.3d at 596–97. Plaintiffs here may be suffering from the growing pains of a rapidly changing for-hire transportation market, with the principles of the free market, competition, technology, and innovation in the driver's seat. While the County's regulation of TNEs has led to increased economic traffic in the for-hire transportation market, Plaintiffs have not identified any legal relief warranted against the County for the alleged stall of their

businesses in that expanded market. Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss Amended Class Action Complaint **[ECF No. 12]** is **GRANTED**. This case is **DISMISSED with prejudice**. The Clerk is direct to **CLOSE** the case, and any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 10th day of April, 2017.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

cc: Magistrate Judge Turnoff
All Counsel of Record